Malcolm R. WOMMACK,
Plaintiff-Appellant,

v.

DURHAM PECAN COMPANY, INC.,
Defendant-Appellee.

No. 82–1334.

United States Court of Appeals,
Fifth Circuit.

Sept. 26, 1983.

Rehearing Denied Nov. 14, 1983.

Wofford, Fails & Zobal, Arthur F. Zobal, Fort Worth, Tex., for plaintiff-appellant.

Sudderth, Woodley & Dudley, Keith Woodley, Comanche, Tex., for defendant-appellee.

Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

This patent infringement action has been brought by the inventor of a patented process against his former employer requesting reasonable royalties for the employer's use of the process in his plant. The employer admits that he used the process and he neither contests the validity of plaintiff's patent nor asserts any right to receive assignment of the patent arising from the contract of employment. Instead, the employer claims he had acquired a shop right or implied license to use the process and he therefore owes plaintiff nothing. We agree with the employer's position and affirm the district court's dismissal.

## FACTS

The following representation of the facts is not contested by the parties. The story is one of an amicable and mutually beneficial employer-employee relationship turned sour. The employer is the Durham Pecan Company of Comanche, Texas. Since 1965, Durham has been in the business of processing pecans. Its operations include shelling the pecans, separating the pecan pieces into various gradations of size and packaging and selling the final product. The employee is Malcolm Wommack. In 1970, Wommack was hired by Durham as a general laborer in its pecan processing plant. His duties included unloading trucks, sweeping floors and moving supplies. His initial salary was $1.80 an hour, and, as might be expected from the nature of his employment, there were no agreements regarding any inventions he might produce.

And yet Wommack proved more curious and clever than expected. The process he ultimately patented indicates that he took a special interest in at least one aspect of pecan processing: the separation of worms from the shelled pecan pieces. The worm-like larvae of the pecan weevil found in pecans hatch there from eggs laid in the pecan shell while still on the tree. If the pecans are to be successfully marketed, these worms must be removed from the shelled pecan pieces. This is one of the stages of pecan processing performed by Durham.

For years Durham employees handpicked the worms from the shelled pecan pieces. The task was made difficult by the fact that the worms were the same color as the pecans. The ability of the handpickers to distinguish visually between the worms and the pecans was improved when, in 1973, Durham began using an ultraviolet (UV) light on its worm table. When illuminated by UV light, the worms and the pecan meat (inside of pecan exposed when broken) fluoresce while the pecan skin (outside of pecan separated from shell) does not. While this process improved the identification of the worms, it solved only part of the problem; it still was difficult for the hand-

pickers to distinguish between the worms and the pecan meat, both of which fluoresced.

Such was the state of the art of worm picking in pecan processing when Wommack conceived his process. On roughly January 25, 1975, Wommack discovered that yellow food coloring blocked the fluorescence produced by the UV light. Working in his home, he conducted some simple experiments using his own equipment and materials.[1] The resulting process required simply that the shelled pecan pieces be soaked in a weak solution of yellow food coloring and then dried. Because the yellow food coloring adhered to, or was absorbed by, the pecan pieces and not by the worms, the UV light now caused only the worms to fluoresce.

On February 17, 1975, Wommack took the precaution of mailing to himself in a certified letter a complete description of the process he had developed. On the same day, Wommack informed his employer, W.M. Durham, who is also co-owner of Durham, that he had developed an improved method of distinguishing the worms from the pecans. Later that evening Mr. Durham accepted his employee's invitation and visited Wommack's home to observe a demonstration. After viewing some treated pecans under a black light, Mr. Durham concluded, "the meats were—had been dulled in color, the white sides were not as prominent, and yet the worms still fluoresced very well." At this time, Wommack did not disclose to Mr. Durham how he had succeeded in dulling the fluorescence of the meats.

It is unclear what, if anything, transpired between February and May of 1975, but during the first week of May, Mr. Durham and Wommack again discussed the process and Wommack explained that the dulling of the pecan meats had been produced by yellow food coloring. Later that week, Durham received and began experimenting with a UV sorting machine. When pecan pieces are run through this machine under

UV light, signal circuits interpret the electrical current received from photocells and accept or reject pieces of distinct luminosity. After the machine was installed and several tests were run with uncolored pecan pieces, Mr. Durham asked Wommack if he could use Wommack's process. Wommack said, "Yes." In only a few hours, Wommack and another Durham employee were able to bring Wommack's homespun process to commercial application in the Durham plant.

When Wommack agreed to permit Durham to use his process, it also was agreed that Durham would loan to Wommack various pieces of sorting equipment for Wommack's home experiments. Several Durham employees transported this equipment to Wommack's house. Based on his personal experiments and on the experience acquired by use of the process in the Durham plant, Wommack prepared a patent application. The application described in detail the process as it was then being used by Durham, including diagrams of Durham's processing operations and equipment. On December 15, 1975, Wommack filed the application in his own name and at his own expense.[2] He showed the application to Mr. Durham sometime during this month.

On January 26, 1976, Wommack was fired,[3] at which point the relationship between Wommack and his former employer disintegrated rapidly. In February 1976, Wommack wrote a letter to Mr. Durham explaining, among other things, "since I have been let go from your Company, the word agreement that you could use my process in your plant, is no longer valid. We need a signed agreement on the use of my process." Mr. Durham promptly responded by explaining his position, "[the process] was all yours. That all I wanted was the right to use this in my plant and you agreed to this." In July of that year, Wommack demanded that if Durham continued to use the process without a signed agreement, he would take the matter to

---

1. These included a pan, a tablespoon, a tea strainer, a hair dryer, a grease platter, a black light, yellow food coloring and some pecans.

2. It issued on December 6, 1977.

3. Mr. Durham testified that the decision to fire was based on personal differences between Wommack and several other Durham employees.

court. Durham continued using the process until sometime in July 1979. This action was brought on November 7, 1979.

This case was submitted to a jury in the form of 26 special verdicts, pursuant to Rule 49(a).[4] The jury found the essential elements of patent infringement, all of which are no longer, and many of which were never, contested by defendant. Plaintiff had devised an improved method of removing worms from pecans (No. 24), the process was "novel" (No. 12), had "utility" (No. 13), and was "not obvious" (No. 14). Defendant's use of the process had "infringed" several of plaintiff's patent claims (Nos. 4–10). Nevertheless, the district court found in favor of defendant based on the finding, supported by the jury's answers to five special verdicts discussed in detail below, that defendant had acquired a shop right. Because a shop right, also referred to as an implied license, is a complete defense to infringement, plaintiff's claim was dismissed.

### Shop Right or Implied License

That an invention was conceived or developed while the inventor was employed by another does not alone give the employer any right in the invention. The employer must show that a mutual understanding existed between the inventor and his employer that the inventor was employed to exercise his inventive faculties for the employer's benefit. If the employer proves this, he acquires ownership of the patent. Durham, however, makes no such claim.

Wommack was hired as a general laborer at $1.80 an hour.

■ Alternatively, if the employee was not hired to invent, the employer may establish a shop right. As commonly stated, a shop right will be found where the employer shows that the invention was developed by his employee during the employer's time or with the assistance of the employer's property or labor.[5] A shop right permits the employer to use the subject of the patent for his own purposes, but not to sell or prohibit others from using it. The inventor retains a valid patent. This circuit has explained the shop right rule in the following manner:

> The classic shop rights doctrine ordains that when an employee makes and reduces to practice an invention on his employer's time, using his employer's tools and the services of other employees, the employer is the recipient of an implied nonexclusive, royalty-free license.

*Hobbs v. United States,* 376 F.2d 488, 494 (5th Cir.1967).

Appellant places particular weight on the language in this and other cases[6] indicating that the invention be "reduce[d] to practice" with the employer's assistance. Although it is unclear precisely what the court in *Hobbs* intended by using this term in the shop right context, reduced to practice has a specific meaning in other patent law contexts. After examining the definition of reduction to practice adopted for purposes of patentability, we will evaluate its effect on the finding of a shop right.

---

4. The Rule reads, in part:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer....

F.R.Civ.P. 49(a).

5. *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 695 (1933); *Gill v. United States,* 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480 (1896). As we demonstrate below, the determination of a shop right involves more than merely an inquiry into the extent or timing of the employer's assistance. *See infra* at 966–967.

6. *See, e.g., Dubilier Condenser,* 289 U.S. at 188, 53 S.Ct. at 557 ("the so-called shopright, ... shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and *perfects an invention* for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention." (emphasis added)); *Solomons v. United States,* 137 U.S. 342, 347, 11 S.Ct. 88, 90, 34 L.Ed. 667 (1890) ("So, also, when one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employes [sic] to develop and *put in practicable form his invention* ...." (emphasis added) (decided on "hired to invent" grounds)).

■ An invention begins when the idea is conceived in the inventor's mind. Its development may proceed to actual use, but it need not for the idea to be patentable. For this, the idea simply must be reduced to practice, which

includes not only [the] reduction [of an idea] to reality, but also sufficient testing or experimentation to demonstrate that the device as it exists possesses sufficient utility to justify a patent, i.e., that the invention is suitable for its intended purpose.

*Stearns v. Beckman Instruments, Inc.,* 669 F.2d 1095, 1099 (5th Cir.1982) (emphasis omitted) (*citing In Re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 280 (5th Cir.1974)). Yet, reduction to practice does not require that the device embodying the invention be mechanically perfect or in a commercially marketable form. *Kardulas v. Florida Machine Products Co.,* 438 F.2d 1118, 1121 (5th Cir.1971).

For the purposes of patentability, therefore, reduction to practice marks a distinct point of time in the development of a novel idea. In the shop right context, *Hobbs* tells us that "when an employee makes and reduces to practice an invention" with the assistance of his employer, the employer acquires a right to use. Appellant reads this to imply that if the employer's assistance does not contribute to the reduction to practice of an idea—for example, if Wommack had reduced his idea to practice before obtaining Durham's assistance—the employer cannot obtain a shop right.

■ This reading of the shop right rule apparently guided the trial of this case and its argument on appeal. It is, however, erroneous. The employer's assistance in the reduction to practice of an idea is not necessary to his obtaining a shop right in the invention. An employee may reduce his idea to practice on his own time before showing his invention to his employer, and nevertheless subsequent employer-employee cooperation on the invention may be suffi-

cient to confer a shop right upon the employer. In fact, the principal consideration in the shop right determination is not the employer's assistance, but the employee's consent.

A license to use the invention of an employee was first granted to an employer by the Supreme Court in *McClurg, et al. v. Kingsland, et al.,* 42 U.S. (1 How.) 202, 11 L.Ed. 102 (1843). This decision, representing the origin of the modern shop right rule, was reached by extending the more general rule,

[t]hat if an inventor makes his discovery public, looks on, and permits others freely to use it, without objection or assertion of claim to the invention, of which the public might take notice; he abandons the inchoate right to the exclusive use of the invention, to which a patent would have entitled him, had it been applied for before such use. . . .

*Id.* 42 U.S. (1 How.) at 207, *quoting Pennock v. Dialogue,* 27 U.S. (2 Peters) 1, 14–15, 7 L.Ed. 327 (1829) (*also citing Shaw v. Cooper,* 32 U.S. (7 Peters) 292, 8 L.Ed. 689 (1833); *Grant v. Raymond,* 31 U.S. (6 Peters) 218, 8 L.Ed. 376 (1832)). Unlike the rule described in *Pennock,* where the patentee's consent to public use rendered his patent invalid, the Court in *McClurg* granted only a nonexclusive license to the employer. The employee-patentee retained a patent valid against all others. As explained by the Court in *McClurg,* the purpose of this limited rule was twofold:

[F]irst, to protect the person who has used the thing patented, by having purchased, constructed, or made the machine, & c. [sic], to which the invention is applied, from any liability to the patentee or his assignee. Second, to protect the rights, granted to the patentee, against any infringement by other persons.

*Id.* 42 U.S. (1 How.) at 208–09.

Although the decision in *McClurg* was compelled by statutory construction not relevant to our case today, based as it is on the equitable principles of a shop right,[7] the

---

7. *See Dubilier Condenser,* 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 695; *Gate-Way, Inc. v. Hill-* gren, 82 F.Supp. 546 (S.D.Cal.1949).

rationale adopted by *McClurg* has been accepted by later courts as the first in the line of cases applying what is now understood as the shop right rule. *See Gill*, 160 U.S. 426, 431–33, 16 S.Ct. 322, 324–25, 40 L.Ed. 480 (1896). The best explanation of the rationale for and development of this rule was produced by the Supreme Court in *Gill*. In that case, the Court explained that,

> [t]he principle [the shop right rule] is really an application or outgrowth of the law of estoppel in pais, by which a person looking on and assenting to that which he has power to prevent is held to be precluded ever afterwards from maintaining an action for damages.

160 U.S. at 430, 16 S.Ct. at 324. This circuit has explained that the finding of a shop right involves two principal considerations:

> First, it seems only fair that when an employee has used his employer's time and equipment to make an invention, the employer should be able to use the device without paying a royalty. Second, under the doctrine of estoppel if an employee encourages his employer to use an invention, and then stands by and allows him to construct and operate the new device without making any claim for compensation or royalties, it would not be equitable

to allow the employee later to assert a claim for royalties or other compensation. *Hobbs*, 376 F.2d at 495 (*citing Gill*).

■ A court therefore must conduct more than merely a quantitative analysis of how much of the employer's assistance was contributed to the process or during exactly what stage of development it was rendered. A shop right is an equitable defense to an infringement action, and the estoppel arising from the employee's consent is the "ultimate fact to be proved." *Gill*, 160 U.S. at 435, 16 S.Ct. at 326. The assistance of the employer "is important only as furnishing an item of evidence tending to show that the patentee consented to and encouraged [his employer] in making use of his devices." *Id.*

### Apparently Irreconcilable Jury Verdicts

At the close of the evidence of the present case, the jury was requested to answer 26 questions in the form of special verdicts. Thirteen of these verdicts asked the jury to determine, in various and often redundant forms, the nature of Wommack's consent and the extent to which Wommack's process had been developed prior to receiving assistance from Durham. We reproduce these verdicts in the margin.[8]

8. QUESTION NO. 1
   Do you find from a preponderance of the evidence that Plaintiff Malcolm Wommack, expressly agreed (oral or written) to give to Defendant a royalty free license to use the process of U.S. Patent No. 4,061,788 as long as Defendant wanted to?
   ANSWER: No
   QUESTION NO. 3
   Do you find from a preponderance of the evidence that Plaintiff's yellow food coloring process was developed by Malcolm Wommack during working hours of Durham Pecan Company Incorporated with the use of the Defendant's machinery and materials?
   ANSWER: No
   QUESTION NO. 15
   Do you find from a preponderance of the evidence that Malcolm Wommack orally agreed that Durham Pecan Company could freely use the process?
   ANSWER: No.
   QUESTION NO. 16
   Do you find from a preponderance of the evidence that Malcolm Wommack reduced the process to practical application while working in the Durham Pecan Company plant?

ANSWER: No
QUESTION NO. 17
   Do you find from a preponderance of the evidence that Malcolm Wommack reduced the process to practical application by using equipment and materials owned by Durham Pecan Company?
   ANSWER: No
QUESTION NO. 18
   Do you find from a preponderance of the evidence that Malcolm Wommack reduced the process to practical application while Malcolm Wommack was on the payroll of Durham Pecan Company?
   ANSWER: No
* QUESTION NO. 19
   Do you find from a preponderance of the evidence that the cost connected with putting the process or invention to a practical use was borne by Durham Pecan Company?
   ANSWER: Yes
* QUESTION NO. 20
   Do you find from a preponderance of the evidence that Malcolm Wommack acquiesced in Durham Pecan Company using the process, in a practical application?
   ANSWER: Yes
QUESTION NO. 21

In reviewing the various jury verdicts relevant to the shop right finding, we respect our constitutional mandate to reconcile apparently inconsistent jury verdicts and thereby avoid vacating and remanding for a new trial: *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); *Alverez v. J. Ray McDermott & Co., Inc.*, 674 F.2d 1037, 1040 (5th Cir.1982). Although upon a first reading the answers to several verdicts appear to conflict with each other,[9] we find that when all of the verdicts are read in light of the uncontradicted evidence, there exists no irreconcilable conflict. This reading of the verdicts supports the finding that Wommack's conduct and Durham's assistance gave rise to a shop right.

As we have demonstrated above, an idea may pass through several stages as it develops from inventor's conception to ultimate commercial use. The law has identified a particular intermediary stage as marking

> Do you find from a preponderance of the evidence that W.M. Durham, Jr. contributed to the concept of the process?
> ANSWER: No
> QUESTION NO. 22
> Do you find from a preponderance of the evidence that Durham Pecan Company contributed to the development of the process?
> ANSWER: No
> * QUESTION NO. 23
> Do you find from a preponderance of the evidence that Malcolm Wommack was in the employ of Durham Pecan Company in a line of work involving the removal of worms or larvae from pecan meats?
> ANSWER: Yes
> * QUESTION NO. 25
> Do you find from a preponderance of the evidence that property of Durham Pecan Company was used to develop or put the invention into practical form?
> ANSWER: Yes
> * QUESTION NO. 26
> Do you find from a preponderance of the evidence that employees of Durham Pecan Company were used to develop or put the invention into practical form?
> ANSWER: Yes
> Stars identify those verdicts relied upon by the district court in support of its finding that Durham had acquired a shop right.

9. Compare verdict numbers 19, 25 and 26 with 16, 17 and 18; 1 and 15 with 20.

10. The answers to the less specific verdicts numbered 3, 21 and 22 add nothing to this reading of the jury's findings.

its reduction to practice. While this stage is critical for purposes of patentability, it is not for the shop right determination. The district court therefore was correct in relying on the answers to verdict numbers 19, 25 and 26—finding that Durham's property and employees assisted in "putting [the process] into ... practical use" and "develop[ing] or put[ting it] into practical form"—to support its finding that Durham assisted in the development of the process. We need not, as appellant contends, hold that verdict numbers 16, 17 and 18—finding that Wommack "reduced the process to practical application" without Durham's assistance—conflict with any other verdicts. All of these findings[10] are supported by the uncontradicted evidence that Wommack conceived, experimented with and perhaps reduced to practice his process without Durham's assistance, and that Durham's resources were used to develop the process further, ultimately to a commercially useable form.[11]

11. In fact, the decision in *Gill* rested on the Court's reading of factual findings remarkably similar to those before us today. There, the Court read "in connection" the following two findings: (1) "the claimant did not use any property of the defendants or the services of any of the employes [sic] of the defendants in making or developing or *perfecting the inventions* themselves" (emphasis added); (2) "the cost of preparing patterns for the iron and steel castings, and of preparing working drawings, and of *constructing working machines* was borne exclusively by the [employer]" (emphasis added). The "inference" drawn from these findings was that

> while the claimant used neither the property of the government nor the services of its employes in conceiving, developing, or perfecting the inventions themselves, the cost of preparing the patterns and working drawings of the machines, as well as the cost of constructing the machines themselves that were made in putting the inventions into practical use, was borne by the government, the work being also done under the immediate supervision of the claimant.

*Id.* at 433, 16 S.Ct. at 325. As we do today, the Court in *Gill* refused to reverse a finding of shop right because the employer's assistance was rendered only after the employee had reduced his idea to practice. The distinction between assistance rendered before and after the reduction to practice was held to be "too narrow ... to prevent application of the [shop right] rule." *Id.* at 433–34, 16 S.Ct. at 325.

■ It must be recalled that the employer's assistance "is important only as furnishing an item of evidence tending to show that the patentee consented to and encouraged [his employer] in making use of his device." *Gill,* 160 U.S. at 435, 16 S.Ct. at 326. The estoppel, arising from the patentee's consent, is the "ultimate fact to be proved." *Id.* Such consent may be proven in more than one way:

> [T]he most conclusive evidence of such consent is an express agreement or license, ... but it may also be shown by parol testimony, or by conduct on the part of the patentee proving acquiescence on his part in the use of his invention. The fact that he made use of the time and tools of his employer, put at his service for the purpose, raises either an inference that the work was done for the benefit of such employer, or an implication of bad faith on the patentee's part in claiming the fruits of labor which technically he had no right to enlist in his service.

*Id.* In the present case, the special verdicts, supported by the uncontradicted evidence, permit only one reasonable inference: Wommack consented to his employer's use in return for Durham's assistance in developing his process to commercial use.

First, we have the evidence of Wommack's objective conduct. Wommack invited Mr. Durham to his house to demonstrate his process. Later, he permitted Durham to adapt its processing operations to accommodate his process. Principally through his efforts, Durham succeeded in reducing his process to commercial application.[12] In addition, Wommack accepted the loan of Durham's equipment in order to conduct his home experiments and relied heavily upon the experience acquired in the Durham plant when preparing his patent application. Wommack permitted Durham to use his process for a full year without any claim for compensation.

If Wommack's objective conduct were the only evidence of consent available in this case, we nevertheless would be persuaded to infer a shop right. Such conduct is sufficient to permit the inference that the work performed in the Durham plant was done for Durham's benefit. A shop right has often been found where the employee merely makes use of his employer's property or labor to develop his process. Such conduct can provide sufficient evidence of consent. *See Gill,* 160 U.S. at 429–34, 16 S.Ct. at 324–25 and cases cited therein.

■ In the present case, however, we have more direct evidence of consent: Wommack's verbal agreement that Durham could use his process. The evidence supporting this theory of a shop right is more like that of an implied license. In fact, a shop right is nothing more than a special case of implied license arising where the consent, or agreement, is inferred from the employee's use of his employer's resources. Direct evidence of an agreement between the parties need not be found. Thus the circumstances giving rise to a shop right are not limited to those in which one can find an implied license.[13] But, as in the present case, where the employer's assistance is provided with the knowledge of the employee's consent, the theories of implied license and shop right merge. The underlying considerations are roughly the same.

> No formal granting of a license is necessary in order to give [a license] effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from which the other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort.

*De Forest Radio Teleph. & Teleg. Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1926).

---

**12.** Mr. Durham testified that by the time his company stopped using the process in 1979, he was convinced that the coloring technique was not profitable. He claimed that the cost of dying the pecans exceeded the efficiency gained by dulling the fluorescence of the meats. This subsequent evidence of unprofitability does not modify the finding that Durham assisted in the reduction of the process to a commercially useable form.

**13.** The circumstances in which an implied license can be found are also fairly broad. The Supreme Court has determined that

In the present case, in addition to the inferences drawn from Wommack's conduct and Durham's assistance, we have more direct evidence of consent. The jury found that Wommack "acquiesced" in Durham's use of the process (No. 20),[14] which finding is supported by Wommack's letters to Mr. Durham, the stipulated facts in the pre-trial order, and Wommack's testimony at trial.[15] Wommack's consent was given without time limitation.[16]

The only evidence before the court tending to qualify the nature of Wommack's consent is his own testimony, "when [Mr. Durham] asked me there in the picking room if he could use my process, I told him yes, but I knew that he was going to have to pay me to use it whenever he satisfied his self."[17] Nevertheless, an unarticulated expectation of compensation will not defeat the estoppel effect of a shop right. Wommack neither alleged nor presented any evidence that he asked for or was promised any monetary compensation in return for his consent to Durham's use. Especially where an employee shows himself to be sensitive to the need to protect his rights to a potentially patentable idea, as Wommack clearly showed himself,[18] we are not reluctant to give full effect to the consent given to his employer.

14. Although it is uncontradicted that Wommack consented to Durham's use, there are two specific jury verdicts which create yet another apparent inconsistency. The jury found that Wommack had not "expressly agreed (oral or written) to give to Defendant a royalty free license to use the process ... as long as Defendant wanted to" (No. 1), and that Wommack had not "orally agreed that Durham Pecan Company could freely use the process" (No. 15). In light of Wommack's failure to allege that he made any request for payment prior to the correspondence following his firing, the only reasonable reading of findings numbers 1 and 15 is that the jury intended to give effect to his subsequent request for payment. These findings therefore are not inconsistent with verdict number 20, finding that Wommack had "acquiesced" in Durham's use.

Furthermore, a claim for compensation made for the first time one year after having consented to and assisted with the employer's use will not defeat a shop right. As with any form of estoppel, once having taken effect to bar a party's subsequent assertion of a contrary position, it cannot be altered.

15. The most convincing evidence of consent is the following:

(1) On February 26, 1976, shortly after having been fired, Wommack wrote to Mr. Durham, "since I have been let go from your Company, the word agreement that you could use my process in your plant, is no longer valid."

(2) Plaintiff stipulated to the following in the pre-trial order, "On May 12, 1975, Plaintiff allowed Defendant to use Plaintiff's new coloring process.... Beginning in May of 1975, Plaintiff allowed Defendant to use his new coloring process in its operations."

(3) At trial, Wommack testified, "May the 12th was when Mr. Durham come to me and asked me if he could use my process. And I said yes." (T. 49). Later Wommack testified that he and Mr. Durham had a "word agreement" that Durham could use the process. (T. 177–78).

16. Wommack testified to this.

Q. Now, when you told Mr. Durham that he could use this process, there wasn't any agreement between the two of you that if something happened to you-all's relationship as an employee and employer, that he could no longer use the process, was there?

A. [Wommack] There was nothing mentioned how long he could use it; no, sir. (T. 170).

17. The estoppel arises not from the "intention" of the patentee, but from a "legal inference" based on the conduct of the patentee. *See Gill,* 160 U.S. at 430, 16 S.Ct. at 324. Conduct indicating a refusal to consent to an employer's use can preclude the finding of a shop right. *See Hobbs,* 376 F.2d at 494. In that case, the court refused to permit a shop right because, among other reasons, the employee "continually refused to waive his patent rights or to negotiate a royalty-free license." *Id.* For instance, when hired as a consultant, the employee in *Hobbs* refused to sign the patent waiver form presented to him, explaining that he had made numerous inventions during his career and it was his custom to retain all patent rights. Wommack fails to allege any conduct on his part that could be so construed.

18. On the day he first demonstrated his process to Mr. Durham, Wommack refused to disclose the manner in which he had dulled the fluorescence of the pecan meats. Earlier that day, he had prepared a detailed description of his process in letter form, and had the letter dated and signed before a notary public by himself, his wife and her parents. Endeavoring to authenticate the date of the letter, Wommack mailed it to himself as a certified letter, and a few days later, enclosed the postmarked certified letter in a registered envelope and again mailed it to himself.

The uncontradicted evidence in this case permits the inference that behind Wommack's express consent was an implicit exchange of consideration. When Wommack first consented to and assisted in Durham's use of his process, he had nothing more than an idea he hoped to patent and sell. The patentability of the process, the manner in which it would be applied in a processing plant and the profitability of such application was uncertain. Yet, the exchange of benefits was certain. Wommack received the opportunity to test his process commercially and to use Durham's equipment in his home for his own experiments. Wommack benefitted from this experience in preparing his patent application; he also may have hoped that proven commercial success in the Durham plant would facilitate the sale of his process to other plants.[19] Durham offered this assistance, at its own risk, with the only possible hope that it would be permitted the continued use of that process.[20]

Having read certain apparently inconsistent jury verdicts in the only manner permitted by the uncontradicted evidence, and having concluded that Durham's assistance need not have been rendered prior to the reduction to practice, we find the resolution of this case clear. Wommack admitted his consent and his employer's assistance in circumstances that support the finding of a shop right. We therefore affirm the dismissal of plaintiff's action for infringement.

AFFIRMED.

---

**19.** Wommack did distribute a description of his process with an offer of sale to several other processors nationwide. He testified that no processors have yet purchased his process.

**20.** This inference is supported by Mr. Durham's testimony that at the time Wommack consented to Durham's use, the understanding was that, "for [the help Durham provided Wommack, Wommack] also said that if anything good came from his experimenting, we would always have the benefit of same. I helped him in every way I could and told him if he came up with anything that would make him money, it was all his. I did not want anything for the use of our equipment, but would of course, expect to benefit from anything he learned. This he readily agreed to and was at the time most appreciative." This claim was never refuted by Wommack, but it need not have been believed by the jury. The inference stands, however, merely as a result of the objective nature of the employer-employee cooperation. *See Gill*, 160 U.S. at 433, 16 S.Ct. at 325.