Earl Jason LARISCEY, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 90–5129.

United States Court of Appeals, Federal Circuit.

Nov. 15, 1991.

John S. Moot, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, D.C., argued, for plaintiff-appellant. Buel White and Lewis B. Gardner, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, D.C., were on the brief, for plaintiff-appellant.

Peter Mark Poulos, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. Stuart M. Gerson, Asst. Atty. Gen., Vito J. DiPietro and Chun–I–Chiang, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., were on the brief, for defendant-appellee.

Before NIES, Chief Judge, NEWMAN and ARCHER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Earl Jason Lariscey appeals the summary judgment of the United States Claims Court,[1] denying his claim for compensation for an invention made while he was an inmate of the Federal Correctional Institution in Bastrop, Texas. Mr. Lariscey states that he invented a jig and cutting device and process to cut Kevlar, a high-strength material used in the manufacture of helmets by the Federal Prison Industries (UNICOR), a government corporation. Mr. Lariscey states that UNICOR took his invention without just compensation, in contravention of the Fifth Amendment of the Constitution.

---

1. *Lariscey v. United States,* 20 Cl.Ct. 385 (1990).

## Background

Mr. Lariscey's statement of facts was generally undisputed, insofar as material to the issues that were decided by the Claims Court on the government's motion for summary judgment.

Mr. Lariscey was employed by UNICOR pursuant to a federal program whereby prison inmates produce goods and provide services for government agencies. *See* 18 U.S.C. § 4121 *et seq.* Since 1978 UNICOR has manufactured military helmets at the Bastrop prison facility. Until the summer of 1986 UNICOR contracted out to the Gentex Corporation the function of pre-cutting the Kevlar used for the helmets. UNICOR decided to bring the cutting function in-house, and in August 1986 began preparations by ordering two cutting tables, each about one hundred feet in length, some cutting knives, and various presses brought in from other plants. UNICOR also purchased a new press at a cost of about $55,000. UNICOR planned to cut the Kevlar using a die and press method, but this method, and all others tried, were unsatisfactory. UNICOR made inquiries about the purchase of sonic cutting knives, at a price of about $35,000 each, and then laser cutting knives, at a price of about $350,000 each. UNICOR did not purchase these knives, because the sonic knife was shown incapable of cutting Kevlar, and the salesman of the laser knife would not guarantee its performance.

Mr. Lariscey was assigned to the team of prison inmates working on the helmet manufacturing project. His duties were to assemble the cutting tables and install power rails for the power supply to the cutting knives. He knew of UNICOR's unsuccessful search for an effective method of cutting Kevlar. On his own initiative, working in his cell in his leisure time and using scrap material, he designed and built an effective cutting device over the course of several months. Mr. Lariscey states that the Associate Warden derided his efforts, calling him "Fred Flintstone" and suggesting that he was building rabbit boxes.

A representative of the Defense Department was scheduled to visit the Bastrop prison facility in December 1986 in connection with the helmet contract. UNICOR still had not found a suitable method for cutting Kevlar. On inquiry through his foreman as to whether his cutting device worked, Mr. Lariscey answered that it did. The Associate Warden directed him to demonstrate it. As Mr. Lariscey prepared to do so, the Associate Warden said "I hope you know what you are doing, because if this doesn't work, I am gone and when I leave there will be a lot of people gone." Mr. Lariscey states that he assumed he had "no choice" when asked to demonstrate his invention.

Mr. Lariscey demonstrated his device, showing that it successfully cut Kevlar. He made some minor adjustments, and UNICOR had a machine shop reproduce the device for use in production of the helmets. Mr. Lariscey told prison officials that he intended to patent the device. He applied for an incentive award, with the recommendation of his supervisor, but UNICOR rejected the application. UNICOR removed him from his work unit and reassigned him to menial duties; Mr. Lariscey states that this was in retaliation for his insistence on compensation. He contacted the Gentex Corporation and offered to sell an interest in his invention, but prison officials disciplined him on the ground that he was conducting a business in violation of prison regulations. He then turned to the courts.

Acting *pro se*, Mr. Lariscey filed suit in the United States Claims Court, asking for a court-appointed patent attorney. He also asked that the government be enjoined from using his invention, and that the prison authorities be enjoined from harassing him because of these events. The Claims Court dismissed the complaint on jurisdictional grounds, *Lariscey v. United States*, No. 587–87C (Cl.Ct. Jan. 29, 1988), but granted leave to file an amended complaint, as he did, asserting claims for taking of property without just compensation and for breach of an implied-in-fact contract. The government moved for summary judgment on both counts. Mr. Lariscey requested court-appointed counsel for the Claims

Court action and a court-appointed patent attorney; these requests were denied by the Claims Court, *Lariscey v. United States,* No. 587–87C, 1988 WL 236366 (Cl. Ct. Mar. 14, 1988) (order), and affirmed by the Federal Circuit. *Lariscey v. United States,* 861 F.2d 1267, 8 USPQ2d 2007 (Fed. Cir.1988).

Mr. Lariscey eventually obtained *pro bono* trial counsel in the Claims Court. However, the court denied his request for discovery and trial, and granted the government's motion for summary judgment. In brief, the Claims Court held that Mr. Lariscey had no protectable property right in his device for cutting Kevlar. The court held that he did not have a trade secret because he did not and could not keep his device secret in the prison environment. The court stated that there could not be a confidential relationship between Lariscey and prison officials—as the government put it, "between a prisoner and his jailer"—and therefore that any property right Lariscey may initially have had was extinguished when he demonstrated his device to prison officials. The Claims Court held, alternatively, that even if Lariscey did have a property right in the device, UNICOR had a shop right to use it without payment. The court also held that there was no implied-in-fact contract, on the grounds that the elements of mutual intent to enter into a contract, and authority of UNICOR officials to contract with Lariscey, were lacking. This appeal followed.

Only the count relating to the asserted taking[2] was appealed. Thus we first review whether Mr. Lariscey had a property right.

### *Was there a property right?*

■ The creator and builder of a machine that is not patented or otherwise divulged to the public has certain common law rights that accompany ownership of tangible personal property. *See* W.W. Allen, Annotation, *Rights and Remedies (Independently of Patent Laws) of One Who*

Makes an Invention or Discovery, or Conceives an Idea or Plan, as Against One Who Utilizes It Industrially or Commercially, or Discloses It, or Threatens to Do So, 170 A.L.R. 449 (1947). *See generally* A. Carter, *The Philosophical Foundation of Property Rights* 13–24 (1989). These rights include the right to possession of the idea and its physical embodiments, the right to limit disclosure to others, and the right to contract for the terms of use by others. *See generally,* Philbrick, *Changing Conceptions of Property in Law,* 86 U.Pa.L.Rev. 691, 702 (1938) (describing property rights as the liberty to use, the power to alienate, and control against interference by others). The laws governing ownership and use of unpatented[3] property and unpublished information thus derive from theories of property, adapted to achieve fairness in commercial relationships, and are rooted in the common law. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002–03, 104 S.Ct. 2862, 2872–73, 81 L.Ed.2d 815 (1984):

> This general perception of trade secrets as property is consonant with a notion of "property" that extends beyond land and tangible goods and includes the products of an individual's "labor and invention."

(quoting 2 W. Blackstone, *Commentaries* 405).

■ The law governing protection of trade secrets has developed in this common law context. There has evolved a complex of equitable and legal criteria designed to balance the protection of proprietary information against the public interest in the free flow of ideas.

A trade secret, as defined in the *Restatement,*

> may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manu-

---

2. U.S. Const. amend. V:
   ... nor shall private property be taken for public use, without just compensation.

3. Patentability and inventorship are not here at issue.

facturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Restatement of Torts* § 757, comment b (1939); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–75, 94 S.Ct. 1879, 1882–83, 40 L.Ed.2d 315, 181 USPQ 673, 676 (1974). Because Mr. Lariscey's jig and cutting device was created, built, and used in Texas, the law of that state applies. *See American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 276, 10 USPQ2d 1129, 1130 (Tex.Ct.App.— Houston [1st Dist.] 1988) (applying the *Restatement*'s definition of trade secret).

■ In accordance with common law rights, and where no statute abrogates such rights, the creator of a device has the right to make, use, and sell it. *See* G. Rich, *The Relation Between Patent Practices and the Anti–Monopoly Laws (Part II)*, 24 J.P.O.S. 159, 166–68 (1942). The common law does not provide the right to exclude others, *see Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 35–36, 43 S.Ct. 254, 256–57, 67 L.Ed. 516 (1923), and absent the right to exclude that is granted by the patent statute, an inventor's recourse to the common law requires that the invention meet the criteria of secrecy as appropriate to the circumstances. *See* 1 R. Milgrim, *Milgrim on Trade Secrets*, § 2.01 (1987) (recognizing difficulty of formulating concise rules of trade secrecy). The foundation of trade secret law is explained in the *Restatement* as intended to protect commercial information from "competitors who do not know or use it". *Restatement*, § 757, comment b.

■ The government states that because the device had been seen by others than Mr. Lariscey, and was demonstrated to UNICOR without an express agreement of confidentiality, it can not be preserved as a trade secret. Mr. Lariscey responds that as a prisoner he could not hide his device, but that it was kept in his cell, thus fully concealed from competitors. Proprietary information may be divulged to others within a defined group, in an environment protected from competitors, under circumstances that recognize its proprietary status. Indeed, a prison would appear to be ideally adapted for the maintenance of secrecy against competitors, and for limiting the group having access to the information. As discussed in *In re Innovative Construction Systems, Inc.*, 793 F.2d 875, 883, 230 USPQ 94, 100 (7th Cir.1986), in determining the nature of the relationship among those with knowledge of a claimed trade secret, all the circumstances must be considered. Mr. Lariscey's demonstration of his working model to his employer and potential customer, UNICOR, was not a release of protected property to a competitor, or by inference or act a public disclosure. Nor was the demonstration an automatic authorization to the customer to take and use the subject of the demonstration for its own purposes. Such unauthorized use is no more justified than the procurement of the secret by improper means, an act condemned in *American Precision*, 764 S.W.2d at 277, 10 USPQ2d at 1131.

■ The government argues that Lariscey's failure to negotiate a confidentiality agreement was fatal to preservation of a trade secret. The pertinent inquiry, however, is whether the recipient of the information was fairly apprised that the information was deemed proprietary. From the circumstances that here existed, it is clear that UNICOR knew that Lariscey had built this device and deemed it to be his.

■ The government suggests that Mr. Lariscey could have kept his invention secret, even in the prison environment, in that he "could have merely kept a design of the invention only on paper", instead of building a working model. The government apparently means that by building a device that could be seen by other inmates, and was seen by demonstration to UNICOR, Lariscey lost his property rights. The construction and demonstration of a prototype does not of itself forfeit the trade secret. The surrounding circumstances control whether there was such public disclosure that defeats the requisite secrecy. *See generally* Milgrim, *supra* at § 2.04. No disclosure to the public was here made. *See, e.g., Brown & Root, Inc.*

v. Jaques, 98 S.W.2d 257, 259 (Tex.Civ. App.—Austin 1936):

> If, however, the manufactured article itself, when sold to the public, reveals or discloses the principle or combination of parts by which such article or machine is created or manufactured, the sale thereof to the public, or the placing of same in the hands of the public, in and of itself discloses and makes public the secret by which it is created or manufactured.

■ The construction in the prison environment and the demonstration of a working model by Lariscey to his employer and potential customer, under the circumstances that here prevailed, was not a dedication or waiver of property rights. It was not a dedication of the information and an abandonment of ownership. Even without giving weight to the exigencies of the prison environment insofar as it affected Lariscey's negotiating posture, the precautions to protect this information from public disclosure were reasonable under the circumstances that prevailed. When property rights are at issue, the common law weighs heavily against forfeiture by implication. *See Acme Process Equipment Co. v. United States*, 347 F.2d 509, 520, 171 Ct.Cl. 324 (1965) (describing forfeiture as "the most drastic penalty known to common law").

We conclude that Mr. Lariscey had a property right in his invention, of the nature of a protectable trade secret. The Claims Court erred in holding otherwise.

### *Was there a taking?*

■ The government asserts that even if Mr. Lariscey had a protectable property right, there was not a "taking" compensable under the Fifth Amendment. The government states that Mr. Lariscey voluntarily demonstrated his device, and acquiesced in its use by the government. However, these circumstances do not negate entitlement to just compensation. In *R.J. Widen Co. v. United States*, 357 F.2d 988, 993, 174 Ct.Cl. 1020 (1966) our predecessor court defined the "taking" of personal property as "a direct interference with or disturbance of property rights" by the deliberate exercise of government power.

Mr. Lariscey does not now challenge UNICOR's use of his jig and cutting device for governmental purposes, subject to just compensation. The Fifth Amendment

> is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.

*First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385-86, 96 L.Ed.2d 250 (1987) (emphasis in original). *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934) (where taking is properly within the power of government, just compensation must be rendered such as to place the owner of the condemned property "in as good a position pecuniarily as if his property had not been taken.")

■ The government argues that Mr. Lariscey lost or waived any right to compensation based on the circumstances of his demonstration to UNICOR. The argument appears to be that even if the status as a trade secret was not lost by the demonstration, Mr. Lariscey acquiesced in UNICOR's use of the device without compensation, since he demonstrated the device without prior negotiation of terms. The government appears to equate Lariscey's acquiescence in demonstration to the intended user, with acquiescence in free use if the demonstration is successful.

The creator of a prototype device does not forfeit the possibility of payment simply by demonstration to or testing by the intended user. Nor is it unusual, even outside of a "prisoner-jailer" relationship, that the terms of payment are not negotiated until after successful demonstration to a skeptical customer. Mr. Lariscey made his wish for compensation known: he applied for an award, sought a patent attorney, argued with prison authorities, and attempted to grant a commercial license; and when these attempts failed, he sought redress from the courts. *See, e.g., Matarese v. Moore-McCormack Lines, Inc.*, 158 F.2d

631, 633–35, 71 USPQ 311, 313–14 (2d Cir. 1946) (imposing obligation of compensation on employer who knowingly used inventive ideas disclosed by employee in expectation of payment). While the government makes much of its contention that Mr. Lariscey did not advise the superintendent of his intention to seek a patent until after the successful demonstration, a fact disputed by Mr. Lariscey, this contention even if proved does not show the abandonment of property rights or waiver of compensation. Indeed, this contention supports the conclusion that Lariscey did not make UNICOR a gift of his invention, and that the government was apprised of his desire for compensation. We conclude that under the conditions of the demonstration, and the other circumstances that prevailed, UNICOR did not acquire a right of use without just compensation.

Thus, unless UNICOR had a shop right because of its employment relationship with Lariscey, there was perforce a compensable taking.

### Was there a shop right?

The Claims Court held, as an alternative ground for its denial of compensation, that UNICOR had a shop right.

▆▆▆ The general rule is that, absent contractual arrangements to the contrary, an independent discovery belongs to the employee, unless the discovery is within the scope and purpose of the employment. See Milgrim, supra at § 5.02[4][e]. The shop right is an exception to that general rule. A common law doctrine founded on equitable principles, the shop right rule allows an employer to use, without payment to the employee, an employee's invention that was made using the employer's time and/or materials, facilities, or equipment. See Wommack v. Durham Pecan Co., 715 F.2d 962, 965–66, 219 USPQ 1153, 1156–57 (5th Cir.1983) (a Texas case applying the shop right rule).

▆▆▆ The shop right has variously been described as a form of implied license, founded on estoppel or acquiescence. Id. at 969–971, 219 USPQ at 1159–1161. See generally, C.T. Drechsler, Annotation, Application and Effect of "Shop Right Rule" or License Giving Employer Limited Rights in Employee's Inventions and Discoveries, 61 ALR2d 356 (1958). The rationale was explained in Hobbs v. United States, 376 F.2d 488, 495, 153 USPQ 378, 384 (5th Cir.1967):

At least two considerations underlie the shop rights doctrine. First, it seems only fair that when an employee has used his employer's time and equipment to make an invention, the employer should be able to use the device without paying a royalty. Second, under the doctrine of estoppel if an employee encourages his employer to use an invention, and then stands by and allows him to construct and operate the new device without making any claim for compensation or royalties, it would not be equitable to allow the employee later to assert a claim for royalties or other compensation. See, e.g., Gill v. United States [160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480 (1896)].

The Court of Claims has applied a similar standard, in various contexts. In LeFiell v. United States, 162 Ct.Cl. 865, 869, 138 USPQ 312, 314 (1963) the court discussed shop right issues as between an inventor and the corporation of which he was president, citing the common law origins of the shop right rule, e.g., McClurg v. Kingsland, 42 U.S. (1 How.) 202, 11 L.Ed. 102 (1843); Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 89, 34 L.Ed. 667 (1890); Gill v. United States, 160 U.S. 426, 435, 16 S.Ct. 322, 326, 40 L.Ed. 480 (1896). The shop right rule has been applied to tangible and intangible property, including trade secrets. See Milgrim, supra at § 5.02[4][c], and cases cited.

▆▆▆ It was undisputed that Mr. Lariscey was not employed to develop, invent, or improve methods for cutting Kevlar. It was undisputed that he was simply a laborer at assigned tasks; that he built the device in his cell after working hours; and that this invention was outside the scope of his employment by UNICOR. Although Mr. Lariscey knew that UNICOR had encountered problems in cutting Kevlar, and intended that his jig and cutting device be

used to cut Kevlar, that does not grant the government a shop right.

 Although the government argues that the scrap materials gleaned from the shop floor were government property, even if discarded, this is an insufficient basis to grant the government a shop right in the device. *See Wommack,* 715 F.2d at 967, 219 USPQ at 1158 ("A court therefore must conduct more than merely a quantitative analysis of how much of the employer's assistance was contributed to the process or during exactly what stage of development it was rendered.") The court in *Heywood–Wakefield Co. v. Small,* 87 F.2d 716, 32 USPQ 265 (1st Cir.), *cert. denied,* 301 U.S. 698, 57 S.Ct. 925, 81 L.Ed. 1353 (1937), held there was no shop right when an employee made a cardboard model of his invention at home and showed it to his employer, who with the employee's consent had a full-sized model built and tested in order to satisfy itself that the device met its needs, and where the employee's duties did not include the making of inventions. *See also Gill,* 160 U.S. at 435, 16 S.Ct. at 326 (employer's assistance "is important only as furnishing an item of evidence tending to show that the patentee consented to and encouraged [his employer] in making use of his devices").

### Conclusion

We conclude that there was not a shop right in the government, that Mr. Lariscey possessed a property right in the cutting device and process, and this property was taken for governmental purposes. The case is remanded to the Claims Court for determination of just compensation.

### Costs

Costs in favor of Mr. Lariscey.

REVERSED AND REMANDED.