**Q–CO INDUSTRIES, INC., Plaintiff,**

v.

**Sidney HOFFMAN, Dilip Som and Computer Prompting Corp., Defendants.**

**No. 85 Civ. 4653 (RWS).**

United States District Court, S.D. New York.

Dec. 24, 1985.

actions under ERISA. *See Donnelly,* 465 F.Supp. at 698. *See also Lojek,* 716 F.2d at 680–81.

**610**

Abberley Kooiman Marcellino & Clay, New York City (Barry Magidoff, of counsel), for plaintiff.

Stanley K. Shapiro, New York City, for defendants.

## OPINION

SWEET, District Judge.

The plaintiff Q–Co Industries, Inc. ("Q–Co") has moved for a preliminary injunction under Fed.R.Civ.P. 65, seeking to bar defendants Sidney Hoffman ("Hoffman"), Dilip Som ("Som") and Computer Prompting Corp. ("CPC") from selling their CPC–1000 program which is alleged to infringe Q–Co's copyrighted VPS–500 program. The defendants have cross-moved to enjoin Q–Co from interfering with the development of the CPC–1000 program and from representing itself to the sole owner of the VPS–500 program. Both programs are software designed to permit use of personal computers as prompters for television and theatre presentations. Teleprompters or prompters are machines which scroll large characters on a television screen to permit a speaker to read a prepared text by looking directly ahead at the screen, thereby avoiding the appearance of reading. On the facts and conclusions set forth below, the injunctive relief requested by Q–Co on its motion and by defendants on their cross-motion will be denied at this time.

This fact-rich case has presented difficult issues for resolution, particularly since the intellectual property at issue is computer programming, a form not readily comprehended by the uninitiated. The challenge to counsel to make comprehensible for the court the esoterica of bytes and modules is daunting. The absence of direct authority dealing with these issues is matched by the ease of access by the parties to the property involved and by the consequent difficult of resolving not only what happened but the effect of these events on the rights of the parties.

### Prior Proceedings

This action was filed on June 14, 1985 and Q–Co promptly sought a temporary restraint. The defendants agreed not to merchandise the CPC–1000 program alleged by Q–Co to have derived from Q–Co's VPS–500 program. Discovery was initiated, and despite disputes over the confidentiality of materials, no present discovery demands are outstanding.

A hearing was held on September 9 and 10, 1985 after which the defendants terminated their voluntary restraint and a motion for temporary restraint was denied. The hearing was resumed on October 10 and completed on the 11th. Final submissions were made on October 24, 1985.

### The Facts

Q–Co is a New York corporation with its principal place of business in New York City. Hoffman is a New York resident and Som a resident of the District of Columbia. CPC is a New York corporation organized early in 1985.

Q–Co registered its VPS–500 software program with the Registrar of Copyrights and received a Certificate of Registration Class Tx., No. 1–568–702 on May 29, 1985. This dispute has resulted from the work Hoffman and Som did to devise the VPS–500 program which permitted the user of the program to employ an Atari 800–XL ("Atari") computer as a prompter, and their subsequent development of the CPC program which seeks to permit a user to employ an IBM PC computer for the same purpose.

Q–Co has been in the business of providing prompting equipment and services to various clients in the business, entertainment and governmental communities for over twenty-nine years. There are a num-

ber of companies other than Q–Co current-ly marketing prompting software packages designed for use on the Atari computer. No company has as yet been able to design a commercially viable program capable of performing prompting on the IBM PC. The principle advantages of an IBM PC-based program are the great public recog-nition and acceptance of the IBM computer and the much larger memory available on the IBM.

However, because of differences be-tween the hardware of the Atari computer and that of the IBM PC, the Atari is sim-pler and better suited to the development of a prompting program. Three basic func-tions are required for the development of a computerized prompter:

1) the generation of large characters on a screen;

2) the scrolling the characters up and down at smooth and variable speeds; and

3) word processing and editing capabili-ties.

While the Atari has a graphics chip built into its hardware which permits the genera-tion of large characters and scrolling through a relatively simple sequence of program commands, the IBM PC has no such hardware. Instead, a lengthy and complicated software program must be de-veloped to enable the IBM to generate large characters and scroll text. This dif-ference has been the principal hurdle block-ing the development of a prompting pro-gram for the IBM–PC.

Q–Co hired Hoffman as a prompter tech-nician in mid-1976 on a part-time basis. In late 1983, Q–Co learned that Hoffman had recently been awarded an advanced degree in the field of computer science and in January, 1984, hired him on a full-time basis to develop a software program to utilize the Atari 800–XL as a prompter. Shortly thereafter, at the suggestion of Hoffman, Q–Co also employed Som, a close personal friend of Hoffman, to work on a hand control device to be a part of the computerized prompter and to assist Hoff-man in the development of the program.

No employment contracts, confidentiality agreements or agreements not to compete were entered into. Hoffman was an em-ployee at will and Som a consultant. Som is a physicist with a masters degree from the University of Calcutta, and a Ph.D. from the City University of New York, who is presently a post-doctoral research assist-ant at George Washington University where he is developing research programs.

At the end of January, 1984, Hoffman commenced work as a full-time employee of Q–Co, to create the computer prompter pro-gram for Q–Co which was later entitled the VPS–500. In creating the VPS–500, Hoff-man and Som, utilized only Q–Co's equip-ment and supplies, including textbooks, provided by Q–Co, albeit in almost all cases purchased by either Som or Hoffman and reimbursed by Q–Co. The equipment in-cluded the Atari computers used by both Som and Hoffman for carrying out all their programming efforts. A program devised by Compu-Prompt, a Q–Co competitor, for use in employing the Atari as a prompter was also provided by Q–Co to Hoffman.

Hoffman had "overall responsibility for the computer prompting project" under Al-vin S. Eisenberg ("Eisenberg"), an execu-tive vice-president of Q–Co, but Hoffman worked so closely with Som that "things were so, like, intertwined together" and it was not possible to separate their work. Hoffman reported to Q–Co's officers on how the overall project was progressing. Although Som ultimately became the prin-cipal programmer for the VPS–500 project, other Q–Co employees or officers were nev-er informed of that fact. In any event, Som and Hoffman both worked very close-ly together, even though geographically separated in New York City and Wash-ington, D.C. during the period February through July, conversing by telephone al-most daily and speaking directly during Hoffman's weekend trips to Som's house once every three weeks when they would work for eight hours a day together. The program as it was developed was the joint product of both men. During this period Hoffman had one or more conversations

**612**

with Q–Co officers and employees to the effect that it would be desirable to develop a prompting program for the IBM PC once the Atari program was completed.

In early August, 1984, Hoffman and Jerry Berg, a Q–Co employee ("Berg"), Hoffman's immediate supervisor, travelled to a suburb of Detroit, Michigan to prepare the text for a prompting job Q–Co was to perform for Marritz Communications Co. ("Marritz") which was acting on behalf of Ford Motor company (the "Ford Show"). While preparing such text, David Davis, an official of Marritz, advised Berg and Hoffman that many of Marritz' customers, including Ford, had need of a computerized prompter to operate on an IBM PC and that he looked forward to an IBM PC program for the following year's Ford show.

After several days in Detroit, Berg and Hoffman travelled to Las Vegas, Nevada to begin rehearsals for the Ford show. Because the VPS–500 was still in the developmental stages, it had insufficient memory for the job and as such required the use of two Atari's being operated in tandem to provide sufficient memory. Berg concluded that he and Hoffman would require assistance in Las Vegas, and Som travelled to Las Vegas for that purpose. In Las Vegas there were again discussions in which Hoffman was involved about a computerized prompter for an IBM PC. In response to Berg, Som on several occasions stated it would be possible to develop an IBM PC computer prompter but that it was very difficult.

Upon returning from Las Vegas in late August, Hoffman, during a luncheon meeting in New York City with his friend of several years, Geoffrey Pope ("Pope"), told Pope that he was thinking about going into his own business with his friend Som and possibly to sell a program for a computerized prompter. In the same period, Hoffman suggested to Eisenberg and Berg that development of the VPS–500 would continue more quickly if he were to move to Washington, D.C. and work more closely with Som. Q–Co agreed and Hoffman moved to Washington, D.C. in early Sep-

tember for the months of September, October and November, 1984.

In the beginning of December, 1984, Hoffman returned to New York City and advised Q–Co that he was going to look for other employment and that he felt the VPS–500 would be completed by December 31, 1984, but that in the event there were any loose ends, he would ask Som to assist Q–Co. On Friday, December 28, 1984, Som and Hoffman demonstrated the latest version of the VPS–500 to Q–Co personnel in Q–Co's New York office.

As of December 31, 1984, Hoffman left Q–Co's employ, having been paid a salary of approximately $25,000 for the preceding eleven months, as well as two bonuses— one in October in the amount of $560 and one at the end of December in the amount of $1,000.

Q–Co was totally unaware of any alleged change in the proportionate responsibility for the VPS–500 as between Hoffman and Som and virtually all communications to Q–Co officers concerning the VPS–500 were made by Hoffman. Hoffman paid additional sums of his own money to Som, without advising Q–Co, including cash payments and checks totalling $1,000. Several checks bore the notation "programming fund" which Hoffman testified related to Som's work on the VPS–500 and did not relate to any specific budget or other purpose.

Som testified that unbeknownst to both Q–Co and Hoffman, he had secured the services of one George Schwenk to do work on portions of the VPS–500 in 1984 paying him approximately $1,000 at the rate of $20.00 per hour.

During December, 1984, Som had collected books and programs that he felt would assist him in developing the IBM program, spending between 180 and 270 hours on the project. In mid-December Som called Martin Smith ("Smith"), a programmer who had developed the Banner program, which was a publicly available software program that produced scrolling and large characters. Som sent a letter dated December 18, 1984 to Smith along with an outline of the

program in which he told Smith that the reason he chose the IBM PC was because of its expanded memory which could hold more text than the Atari for which he had already developed a program. At this time Som and Smith discussed the possibility of developing the IBM PC prompting program. Som sought Smith's assistance in programming what was to become the CPC–1000 and Smith carried out "Som's vision of the program" based upon numerous telephone discussions and correspondence with Som and exchanges of ideas and information. During this period Som was also completing his work on the VPS–500. While Som was in New York, Hoffman loaned Som $1,000 because Som claimed he was running out of money. Upon his return to Washington, D.C. in late December, Som sent Smith a payment in the amount of $2,150 and purchased a monitor and various supplies related to the CPC–1000 project totaling $777.85.

Som sent Smith an initial custom-made hand control device for the IBM PC program in late December or early January, and Smith sent a character generator or utility program to Som on January 2, 1985. Smith and Som agreed at the outset, in December, 1984, that Smith would create an editor as well as the scroll program. Smith was paid only for work previously completed, and the first payment was made by check dated January 1, 1985. Despite several inquiries by Smith to Som, all Som told Smith was that he was developing an educational program to assist in reading comprehension and that he was doing so for one particular client.

On January 9, 1985 Hoffman as sole incorporator acquired a New York Certificate of Incorporation for Computer Prompting Corp. which was issued on January 14, 1985. Both Som and Hoffman are vice presidents of CPC, and although the formalities are unclear, according to Som's uncontradicted testimony, they are 50–50 owners of the corporation. Aware of the deadline for the National Association of Broadcasters ("NAB") show in Las Vegas, at which broadcast industry products are exhibited, Hoffman on February 8, 1985 sent an application and check in the amount of $1,200 to reserve space at the show in April on behalf of CPC, although at that time no program was in fact in hand. By the end of February, 1985, Som had completed his work for Q–Co on the VPS–500 and was working with Smith on the CPC–1000. A brochure was prepared for the NAB Show announcing that "with the arrival of the CPC–1000 the future is now" and promoting the fact that the new program would operate on the IBM PC.

For the next two or three months Som worked on the average of three hours a day on the CPC–1000. A copyright application for the CPC–1000 was filed on April 11, 1985. It was conceded that the CPC–1000 is still in its "final developmental phase," from which it has yet to emerge.

The CPC–100 program at the time of the NAB show consisted of two floppy discs with a capacity of 1,000 lines, the second disc containing fragments rather than a complete working program. It's disclosure was, nonetheless, a shock to Q–Co and after initial discussions at which merger was suggested, on June 14 this action was commenced. According to Som, at the time of the hearing, no further work has been done on the program although presumably the completion of the program would be undertaken in the future. No orders have been received although interest has been expressed.

The defendants introduced evidence that Q–Co in the past had sought to enjoin competitors from unfair competition and had a British affiliate that also had done some work on an IBM prompter program during the period in question without obtaining an operational result.

**The Programs**

Both parties called individuals qualified as computer experts to testify about their examinations of the VPS–500 and the CPC–1000 programs. The differences between the programs arise primarily from the hardware deficiencies in the IBM–PC relevant to the screen display. The display controller in the Atari hardware, specifical-

ly the "ANTIC" chip and "CTIA" and the so-called "player missile graphics," easily permit the display and scrolling of large characters and provide an "arrow" to indicate the position of the prompter on the screen. The lack of this hardware capability in the IBM–PC requires extra programming in the CPC–1000. The design decisions made by the programmer of the CPC–1000 reduced the time and effort needed to prepare the CPC–1000 program although it unnecessarily restricted the capabilities of the IBM PC, with regard to total memory capacity. The CPC–1000 program is not a copy or a paraphrase of the Atari-based VPS–500. The CPC–1000 program is written in different computer languages (Pascal and IBM Assembler) than the VPS–500 (Basic and Atari), and employs wholly distinct algorithms.

The CPC–1000 program is comprised of a total of four modules, which correspond directly to four of the twelve modules of the VPS–500 program. The four CPC–1000 modules are as follows: A Pascal language "Title" module that presents an initial screen including the title and credits of the program. A second Pascal language module "reads in" or loads the third and fourth modules from the disc into the computer's internal memory, and then presents a main menu to the user. The main menu includes the terms "Create," "Save," "Load," "Edit," "Prompt," "Print," "Sub Menu," and "Help." The third module of the CPC–1000 is in Assembler language and provides the functions of text scrolling and editing. The fourth module generates the "large characters" for display on the computer screen.

The four corresponding modules in the VPS–500 program are similar in structure and organization, including a few textual similarities. The memory provided in the CPC–1000 is only about twice that of the VPS–500, although the IBM–PC is capable of providing ten times the internal memory of the Atari.

In terms of overall organization of the two programs, Dr. Friedberg, Q–Co's expert, stated that the basic fact that there are four modules in the VPS–500 which correspond closely to the four modules of the CPC–1000 is itself most surprising, except in the context of a conversion of the VPS–500 program to the CPC–1000. Extensive differences between the two programs should arise by virtue of the gross differences in the hardware. Specifically, the reason for having a separate "Title" module in the VPS–500 was the much smaller internal memory in the Atari. This rationale was not expected to be present in a program independently created for the IBM–PC, which has no such internal memory limitations. There is no need to have a separate "Title" module merely to put in the first screen in the CPC–1000, especially when the second module of the CPC–1000 already provides much of the same information. Since the CPC–1000 uses the identical organization of a separate title module, this supports Dr. Friedberg's interpretation that the CPC–1000 was a conversion of the VPS–500.

There is also a similarity in the terminology used in the respective menu lists in the second module of each of the two programs. The first five functions of the CPC–1000 and VPS–500 menus include substantially the same terminology, although in different sequences: "Create," "Edit," "Save," "Load," "Prompt." The VPS–500 also including the word "Text" after each term.

The organization of the CPC–1000 program is also similar to that of the VPS–500 program, with respect to providing for the load, edit and scrolling, or "prompting" functions. In both programs, the "load" function is provided by the second module, in a high level language (BASIC for the VPS–500 and Pascal for the CPC–1000), while the scrolling and editing functions (with one exception) are provided by the third module (in assembly language).

Finally, the fourth module of the CPC–1000, which generates the large characters to be scrolled, is comparable to the fourth module in the VPS–500. The characters for the CPC–1000 are defined and generated in the same way as in the VPS–500.

The VPS–500 program operates the Atari in its "text" mode, while the CPC–1000 operates the IBM–PC in its "graphics" mode. The same approach of generating the characters point-by-point was followed in both programs.

Hoffman, and more particularly Som, were completely familiar with the VPS–500 program using the Atari; indeed they had created the program. It is reasonable to infer from the facts already found that in the fall of 1984 Som and Hoffman concluded that an effort would be made to develop the software to program an IBM PC to provide a prompting function. Som, an independent consultant for Q–Co, started this endeavor late in 1984 while still working for Q–Co.

There is no direct evidence that Som employed the VPS material and indeed direct copying was impossible since the Atari programming was in Basic and IBM in Pascal. What Som did employ was the structure and concept of the VPS–500 program. In one or two minor instances, some language of the VPS–500 crept into the CPC–1000 program. At the same time, a different program, different because of language and hardware, had to be devised. From the similarity of the modules, their structure and function and the obvious availability to Som of the VPS–500 program, it is rational to infer that it was used by Som, although not by Smith, in developing the CPC–1000 program.

**Conclusions**

Q–Co seeks relief on the basis of copyright infringement and misappropriation of trade secrets. As to copyright, the applicable statute, Title 17 U.S.C. 501(a) (Copyright Act of 1976) provides:

Anyone who violates any of the exclusive rights of the copyright owner as provided by Section 106 ... is an infringer of the copyright.

Section 106 of the Act provides:

The owner of a copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies

...; (2) to prepare derivative works based upon the copyrighted work....

However, copyright protection extends only to forms of expression and not ideas, 17 U.S.C. Section 102(b); *Milgrim on Trade Secrets,* Section 2.09 at 2–179 (1984). As the Court of Appeals stated in *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (L. Hand, J.): "There can be no copyright in the 'ideas' disclosed but only in their 'expression.'"

Thus, in *Affiliated Hospital Products, Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183 (2d Cir.1975), the court held that the copyright of a game book was not infringed where the defendant did not copy the copyrighted work verbatim, but rather made a good-faith attempt to improve upon and clarify the presentation of the rules. The evidence establishes that the modules in different languages were similar in the sense of "ideas" rather than "expressions" and as such have not been copied in the infringement sense.

The extent of similarity between the two programs is more significant when considering the CPC–1000 as a derivative work, *i.e.,* "a work based upon one or more pre-existing works, such as a translation, ... or any other form in which a work may be re-cast, transformed or adopted" (17 U.S.C. 101). This definition includes a "modification which, as a whole, represent an original work of authorship...." Thus, the mere fact that the CPC–1000 is in many respects dissimilar from the VPS–500 would not avoid infringement if similarity is shown within the CPC–1000 for a substantial element of the VPS–500 program, including structure and arrangement. *Meredith Corporation v. Harper & Row Publishers, Inc.,* 378 F.Supp. 686 (S.D.N.Y.); *aff'd,* 500 F.2d 1221 (2d Cir.1974), *after trial,* 413 F.Supp. 385, 386 (S.D.N.Y. 1975). "No plagiarist can excuse the wrong by showing how much of his work he did not pirate," and is different from plaintiff's. *Sheldon v. Metro Goldwyn Pictures Corp.,* 81 F.2d 49, 55 (2d Cir. 1936). Similarly, the fact that the CPC–

1000 may itself constitute a copyrightable creation in no way excuses the infringement, because the "tests for eligibility for copyright and avoidance of infringement are not the same. *Puddu v. Buonamici Stationery, Inc.*, 450 F.2d 401, 402 (2d Cir. 1971).

No decision of our Court of Appeals has been cited involving a computer program under the Copyright Act. However, courts have considered the relevance of similarities of structure and organization of computer programs in determining copying. It has been stated that the programming in source code of a detailed English-language statement of a problem solution would result in duplication of expression and copyright infringement. *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003 (N.D.Texas 1978). In the present case, the defendants had available the plaintiff's source code, which potentially offers a far "simpler route of copying." *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816, 225 U.S. P.Q. 916, at 923 (M.D.Tenn.1985).

Basing its decision upon the Second Circuit's opinion in *Merdel Game Mfg. Co.*, *supra*, where the defendant prepared an outline of a textbook and then distributed the outlines "to other personnel, and they wrote original text based on the outline," the court in *SAS Institute* found duplications of expression and copyright infringement where the defendant claimed that each individual programmer was "provided a specific statement of the task to be performed by a program module, and was given information as to the way in which that module of code would interface with the remainder" of the program, without being told of the source of the material. This is similar to what occurred between the defendant Som and Smith. Som admitted to Smith that he originally "wrote this program on Atari 800XL in BASIC and partly in Assembler ... the reason for writing it on IBM is that I can have more text." Further, here, as in *SAS*, Som placed himself at "the hub of the wheel," controlling the information given to his assisting programmer and writing the source code for the modules linking the programs together.

■ Notwithstanding these facts, there is no testimony establishing any unique expression based on the existence of the VPS–500 modules, since the same modules would be an inherent part of any prompting program. *See Synecom Technology, Inc.*, *supra*, 462 F.Supp. at 1013. Their order and organization can be more closely analogized to the concept of wheels for the car rather than the intricacies of a particular suspension system. Moreover, in contrast to the factual finding in *SAS Institute, supra*, that the defendant had "slavishly copied" plaintiff's work, such copying is impossible here, given the differences between the hardware for the Atari and IBM computers. Here, it was the idea which was used rather than its expression. Therefore, copyright infringement has not been established.

### Trade Secrets

All of the parties to the action agree that the VPS–500 is an independent original creation, made by defendants Hoffman and Som during the period of their employment by Q–Co. New York courts have adopted the general definition of a trade secret set forth in Restatement of Torts § 757, comment b (1939), as follows:

> A trade secret may consist of any formula, pattern, device, or compilation or information which is used in one's business and which gives him an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device ... The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret ...
>
> Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He

may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret.

*See, e.g., Minnesota Mining & Manufacturing Co. v. Technical Tape Corp.*, 23 Misc.2d 671, 192 N.Y.S.2d 102, 112–13 (Sup. Ct.Westchester Co.1959), *aff'd*, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dept.1962); *KLM Royal Dutch Airlines, N.V. v. DeWit*, 98 Misc.2d 946, 415 N.Y.S.2d 190, 191 (Sup.Ct.N.Y.Co.), *modified*, 70 App.Div.2d 867, 418 N.Y.S.2d 63 (1st Dept.1979).

■ Although information that is generally known cannot be a trade secret, *Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980), absolute secrecy is not required. *Fairchild Engine and Airplane Corp. v. Cox*, 50 N.Y. S.2d 643 (Sup.Ct.1944). As noted by this Circuit:

> [t]he rule is only that a "substantial element of secrecy must exist and this means so much that" except by use of improper means, there would be difficulty in acquiring the information.

*A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 16 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).

■ It is a well settled principle "that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Imperial Chemical Indus. Ltd. v. National Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965). Computer software, or programs, are clearly protectible under the rubric of trade secrets, if the other elements are also proven. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 534, *rehearing denied*, 505 F.2d 1304 (5th Cir.1974). When an individual is expressly employed "to devote his time to the development of process and machinery and was to receive therefore a stated compensation," the resulting development is the property "of him who engage the services and paid for them." *Standard Parts Co. v. Peck*, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 566 (1924); *Mechanical Plastics Corp. v. Thow*, 197 U.S.P.Q. 651 (N.Y.Sup. Ct.Nassau County 1977).

■ Employees in the position of Som and Hoffman have been held to owe an implicit obligation of good faith and fair dealing to their employer. *Kaufman v. International Business Machines Corp.*, 97 A.D.2d 925, 470 N.Y.S.2d 720, 723 (3d Dept.1983), *aff'd*, 61 N.Y.2d 930, 474 N.Y. S.2d 721, 463 N.E.2d 37 (1984). To maintain confidentiality, it is not necessary that there have been an express contract between Q–Co and its employees Hoffman and Som, stating that information regarding the VPS–500 be kept secret. *Arnold's Ice Cream Co, supra*, 330 F.Supp. at 1187; *L.M. Rabinowitz & Co., Inc. v. Dasher*, 82 N.Y.S.2d 431, 435 (Sup.Ct.N.Y.Co.1948); *Speedry Chemical Products, Inc. v. Carter's Ink Company*, 306 F.2d 328, 332 (2d Cir.1962). Under New York law, an employee is "not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment...." *Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754 (E.D. N.Y.1977).

The source code of the VPS–500 program is not accessible to the public. The version of the VPS–500 program sold commercially was copy protected so that the purchasing public would not be able to convert the program on the floppy disc and would not be able to gain access to the source code. Only the object code is publically available; this the version of the program that is intended to be read by the computer and cannot be understood even by expert programmers.

In *Telex Corp. v. IBM*, 510 F.2d 894, 911, 928–30 (10th Cir.1975), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), the court upheld a finding that trade secret protection remained available even though

IBM's object code was in daily, open unrestricted use by employees since its more readily copyable source code was kept securely locked. Similarly, in *Com-Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp. 1229, 1234–35 (E.D.Mich.1971), *aff'd*, 458 F.2d 1341 (6th Cir.1972), the court was influenced by the fact that the plaintiff had inserted passwords into its system to prevent unauthorized access and had kept its magnetic tapes and symbolics locked when not in use. *See also McGrody Protection of Computer Software—An Update and Practical Synthesis*, 20 Hous. L.Rev. 1033, 1063 ("Secrecy will not be destroyed by the wide distribution of computer programs if they are distributed in object form only.") The internal precautions taken by plaintiff to guard the VPS–500 source code listings have been adequate since the nature of the trade secret is not ascertainable by inspection of the program.

Som testified that in creating the CPC–1000, he had employed Smith to assist him. In so doing, he discussed the VPS–500 program (although without identifying it to Smith) and clearly described to Smith the "vision" of the CPC–1000 he had in his mind. Therefore, at least some of the trade secrets to be found in the VPS–500 program were communicated to outsiders. Moreover, one can infer from their close relationship that Hoffman and Som collaborated in this overall plan to develop a competing teleprompter program during this time period.

It is well recognized with respect to trade secrets that:

[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*Greenberg v. Croydon Plastics Co. Inc.*, 378 F.Supp. 806, 814 (E.D.Pa.1974).

For the foregoing reasons, Q–Co. has met its burden on this motion for a preliminary injunction of establishing a likelihood of success on the merits regarding the existence of a trade secret, and its misappropriation by Hoffman and Som.

**Irreparable Injury**

The standard set in this circuit for obtaining preliminary injunction relief is a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

While Q–Co meets either of the second set of tests set down in *Jackson Dairy, Inc., supra*, it fails on the first. So far the CPC–1000 program is inoperable, and may never succeed. No sales have been made by CPC or demonstrated to have been lost by Q–Co. It would appear that as yet no one has succeeded in developing an appropriate software package for an IBM PC to enable it to perform a scrolling function. The threat that CPC may do so in the future fails to establish present irreparable injury.

Similarly, the use of the Q–Co trade secrets has not to date caused irreparable damage incapable of calculation. Indeed, should CPC's efforts ever be successful, it should be possible to determine the contribution made by the use of Q-Co's trade secrets and assess an appropriate monetary damage. To date, however, no such damage exists.

**The Cross-Motion**

No evidence has been introduced by CPC sufficient to establish an antitrust violation by Q–Co in terms of market-effect or any other element. Instead CPC relies solely on the argument that Q-Co's present action

is "baseless" and therefore should be seen as nothing more than an attempt to interfere with the business relationships of a competitor. *See United States v. Otter Tail Power,* 417 U.S. 901, 94 S.Ct. 2549, 41 L.Ed.2d 207 (1974); *California Motor Transport co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The above conclusion that Q–Co has presented claims having a likelihood of success, however, vitiates the basis for CPC's antitrust claim.

 Som also claims part ownership in Q–Co's VPS–500 program. In its copyright registration, Q–Co is designated as the author of the "work made for hire" entitled VPS–500 and the registration is prima facie evidence of Title 17 U.S.C. Sec. 410(c). Under the definition of "work made for hire" in the 1976 Copyright Act, 17 U.S.C. 101(1), "a work made for hire is a work prepared by an employee within the scope of his or her employment." Both of the individuals employed by Q–Co to create the VPS–500, *i.e.,* Hoffman and Som, were working within the scope of their employment when they jointly created the VPS–500 on behalf of Q–Co.

It is recognized that the Copyright Law of 1976, under which this case is to be determined, changed the prior law with respect to what can constitute "a work made for hire" (17 U.S.C. § 101), in requiring that, except in certain limited circumstances not relevant here, it only applies to "a work prepared by an employee within the scope of his or her employment...." Under the facts found here, regardless of what title Som chose to operate under with regard to his employment by Q–Co, he was an employee working with equipment and supplies owned by his employer Q–Co and was closely supervised by Q–Co's regular employee, Hoffman. It is clear that Q–Co., the hiring "author" caused the work to be made and exercised the right to "direct and supervise the creation," through its control over its full time employee, Hoffman. The VPS–500 was, therefore, a "work made for hire" for the hiring author, Q–Co. *See* 17 U.S.C. § 26; *Samet & Wells, Inc. v. Sha-*

*lom Toy Co., Inc.,* 429 F.Supp. 895 (E.D.N.Y.1977), *aff'd mem.,* 578 F.2d 1369 (2d Cir. 1978).

On these findings of facts and conclusions of law, both motions for preliminary injunctive relief will be denied.

IT IS SO ORDERED.