

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00057-CR
_____

FRANK HERBERT MCCLAIN, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 159th Judicial District Court
Angelina County, Texas
Trial Court No. 25,734

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

Frank Herbert McClain, Jr., appeals his conviction for theft of trade secrets.[1]  McClain was employed for several years by Didrickson Associates, Inc., to repair circuit boards which formed part of the control mechanism for General Electric (GE) gas turbines.  When McClain left Didrickson Associates to form his own business, McClain removed approximately 100 backsheets, or circuit diagrams, from the files of Didrickson Associates.  McClain later returned the files to Didrickson Associates.  Approximately four years later, the State charged McClain with theft of trade secrets.  A jury found McClain guilty, and the trial court assessed punishment at seven years' imprisonment.  McClain argues 1) the evidence is legally insufficient, 2) the evidence is factually insufficient, 3) the trial court erred in revoking McClain's bond, and 4) the trial court erred in instructing the jury concerning the definition of "owner."

## I.      Factual Background

At the time of the alleged offense, Rhonel Didrickson, an engineer, was the primary owner of Didrickson Associates, which, among other things, provided technical engineering support for "aero-derivative packages"[2] and for GE gas turbines.  The GE gas turbines on which Didrickson Associates worked are used for a variety of purposes, such as the generation of electricity, driving

---

[1]This case has been transferred to this Court as part of the Texas Supreme Court's docket equalization program.

[2]Didrickson testified the "aero-derivative gas turbines" are gas turbines located on airplanes which are "directly coupled to their compressors and their gears."

2

pumps or compressors, and driving ships. GE began to phase out the older turbines and ceased the manufacture of the cards which controlled them so, in the early nineties, Didrickson Associates hired Ed Watson to start an electronics laboratory to repair existing circuit boards (the trade refers to these circuit boards as "cards") which formed a necessary part of the control panels for the GE turbines. The control panel introduced as an exhibit at trial contained over 100 such cards, although some of the cards were duplicates. Prior to starting the electronics laboratory, Didrickson Associates had merely repaired the controls or replaced the circuit boards. In order to repair the cards, it is necessary to first obtain a diagram of the circuit. That diagram is referred to as a "backsheet." Didrickson Associates assembled its large inventory of these backsheets through four primary means. Most of the backsheets accompanied the cards or panels which had been purchased; others were obtained from training schools which were attended by Didrickson Associates employees, from customers who had hired Didrickson Associates to repair a card, and from prior competitors when they retired.

During the course of operating the electronics laboratory, Didrickson Associates had three electronic technicians in succession: Watson, McClain, and Scott Fiester. Didrickson Associates hired McClain to replace Watson, and Fiester succeeded McClain. During his three-year tenure with Didrickson Associates, McClain was the only electronics technician employed by the company. During his employment, McClain expressed an interest in purchasing the electronic card repair portion of the business, but the parties were not able to agree on a price.

While an employee of Didrickson Associates, McClain decided to generate and keep as work-saving devices typewritten set-up sheets which summarized some of the information on the backsheets, and continued to do so during his employment.  In some circumstances, summaries of information were written on the backsheets themselves.  Didrickson admitted that most of his competitors will write an operating procedure based on the backsheet and that the backsheet usually has all of the information needed to repair a defective or inoperable card.  All of the information on the set-up sheets, though in different form, was contained on the backsheets.  In other words, the set-up sheet was a "map" and was "an index to kind of cut through the chase."

McClain was on vacation from July 2–11, 2001.  During McClain's absence from work, Didrickson determined that some 100–150 backsheets were missing from the electronics laboratory, but these were subsequently returned.  Shortly thereafter, McClain (who had no formal employment contract containing a covenant not to compete) started his own business repairing cards and sent letters to customers of Didrickson Associates announcing his resignation from his former employer.

## II.    We Lack Jurisdiction Over the Revocation of McClain's Appeal Bond

As a preliminary matter, we will address McClain's third point of error.  McClain claims that the trial court erred in revoking his appeal bond.  For the reasons heretofore stated in our order issued April 23, 2008, on McClain's motion for preference, we reaffirm that we lack jurisdiction over this complaint.  The right to appeal from a ruling on bail pending appeal is governed by Article 44.04(g). *See* TEX. CODE CRIM. PROC. ANN. art. 44.04(g) (Vernon 2006).  Such an appeal "is separate from

4

the appeal of the conviction and punishment, and it must be perfected by a separate notice of appeal." *Davis v. State*, 71 S.W.3d 844, 845 (Tex. App.—Texarkana 2002, no pet.); *see also Faerman v. State*, 966 S.W.2d 843, 848 (Tex. App.—Houston [14th Dist.] 1998, no pet.). McClain has not filed a separate notice of appeal as required by Rule 31 of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 31; *Faerman*, 966 S.W.2d at 848. McClain's third point of error is overruled.

## III. The Sufficiency of the Evidence

Intellectual property protections in the United States exist for the primary purpose of providing incentives to invest and create. Robert P. Merges, et al., INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE, 12 (2d ed. 2000). Such protections, though, will impose certain social costs on the public, such as decreasing the free exchange of ideas. The extent that intellectual property is protected seeks to balance "the social benefit of providing economic incentives for creation" against "the social costs of limiting the diffusion of knowledge." *Id*. at 15.

The principal modes for protection of intellectual property rights include patent, copyright, trademark or trade dress, and trade secrets. *Id*. at 1–2. Unlike the other principal modes of intellectual property protection, trade secret protection only protects an owner from misappropriation of or the unlawful discovery of an idea. In order for there to be a violation of the right to protect a trade secret, the actor must have wrongfully acquired the information. *Id*. at 35.

Under the Texas Penal Code, a person commits theft of a trade secret if he or she, without the owner's effective consent, knowingly: "(1) steals a trade secret; (2) makes a copy of an article

5

representing a trade secret; or (3) communicates or transmits a trade secret." TEX. PENAL CODE ANN. § 31.05(b) (Vernon 2003). Section 31.05 of the Texas Penal Code defines trade secret as being "the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes." TEX. PENAL CODE ANN. § 31.05(a)(4) (Vernon 2003). Unlike the general theft statute, theft of trade secrets does not require the State to prove intent to deprive the owner of the trade secret.[3] *Compare* TEX. PENAL CODE ANN. § 31.05 (Vernon 2003) *with* TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2008).

Texas caselaw has clarified the above definition of trade secrets in a number of ways. Most relevant to this case, the Dallas Court of Appeals has held that a trade secret cannot be something within public knowledge. *See Leonard v. State*, 767 S.W.2d 171, 175 (Tex. App.—Dallas 1988), *aff'd sub. nom. Schalk v. State*, 823 S.W.2d 633 (Tex. Crim. App. 1991). In two opinions focusing on whether security measures were sufficient to secure secrecy, the Texas Court of Criminal Appeals has refined the secrecy element of trade secrets. *See Weightman v. State*, 975 S.W.2d 621, 624 (Tex. Crim. App. 1998); *Schalk*, 823 S.W.2d at 640. "It is axiomatic that the core element of a trade secret

---

[3]Because tangible property, which consists of physical property composed of atoms, can occupy only one place at any given time, the right to exclude others lies at the core of the traditional Western concept of property. Robert P. Merges, et al., INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE, 2 (2d ed. 2000). Intellectual property, as intangible property, does not have this inherent characteristic of exclusivity. *Id*. The exchange of ideas does not deprive the original owner of the idea. *Id*.

must be that it remain a secret." *Schalk*, 823 S.W.2d at 640. However, "absolute secrecy is not required"; rather, a substantial element of secrecy must exist. *Id*. (citing *Q-CO Indus., Inc. v. Hoffman*, 625 F.Supp. 608 (S.D.N.Y. 1985)). A substantial element of secrecy exists when "'except by use of improper means, there would be difficulty in acquiring the information.'" *Hoffman*, 625 F.Supp. at 617 (quoting *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968)).

In reviewing the legal sufficiency of the evidence in a case before us, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *see Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *see also Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). "Although an appellate court reviewing factual sufficiency has the ability to second-guess the jury to a limited degree, the review should still be deferential, with a high level of skepticism about the jury's verdict required before a reversal can occur." *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

7

McClain challenges the sufficiency of the evidence in three ways: a) the security measures taken by Didrickson Associates were insufficient; b) the alleged trade secrets are not trade secrets; and c) McClain had the right to his own work product. In our analysis, we will confine our discussion to the theories advanced by the State—that each backsheet, individually, is a trade secret or that the improvements to the backsheets are trade secrets.

### A. The Evidence of Security Measures Is Sufficient

The State argues the backsheets are trade secrets because Didrickson Associates took sufficient security measures to ensure they remained secret. The Texas Court of Criminal Appeals has stated, when determining whether security measures were effective, the following factors are relevant: (1) nondisclosure agreements; (2) plant security; (3) access to information; and (4) other measures. *Schalk*, 823 S.W.2d at 636–37.

The record contains some evidence of security measures to ensure that the backsheets remained secret. The building in which they were kept was secured with an alarm and deadbolts. The filing cabinets in which the backsheets were usually stored were kept locked and only McClain and Didrickson had keys. Although there was no formal nondisclosure agreement as a part of McClain's employment,[4] Didrickson testified that he had explained to McClain the need for secrecy.

---

[4]Further, the Texas Court of Criminal Appeals has noted there is an implied duty of confidentiality by virtue of the employment relationship even in the absence of an express written agreement. *Schalk*, 823 S.W.2d at 640. "Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment." *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

The record, though, also contains some contrary evidence. As pointed out by McClain, Didrickson Associates did not diligently protect the backsheets. Didrickson admitted on cross-examination that he would share the backsheets with customers and on at least one occasion had shared a backsheet with a competitor. Although most of the backsheets were kept locked in the filing cabinet, Didrickson admitted that the backsheets which were in most common use were kept in a binder which was not secured.

We are unable to reach the high level of skepticism required to disturb the jury's finding on this point. Didrickson's credibility is the sole province of the jury. The contrary evidence is not strong enough to overcome the deference we grant to the jury. The evidence of security measures is sufficient for the jury to have concluded that Didrickson Associates took measures to ensure that the information remained secret.

**B.      The Backsheets Are Not Trade Secrets**

At trial, the State argued the backsheets[5] are trade secrets because they contain technical information and have value. In order for a person to commit theft of a trade secret, the information taken must be a trade secret. The simple fact that information has value does not make that information a trade secret. McClain argues the backsheets are not trade secrets because they are public information.

---

[5]The backsheets introduced as exhibits were from the files of Didrickson Associates. Didrickson testified the backsheets were those which McClain had removed and later returned.

The record conclusively establishes the backsheets were public knowledge. Didrickson admitted the backsheets had been placed in the public domain by GE, the original publisher. When asked, "[Y]ou're not claiming an intellectual property right or the ownership of the trade secret that is labeled proprietary information of General Electric Company, are you? You're not the sole --," Didrickson testified, "I did not design that circuit. I'm not claiming I own the design of that circuit. I'm claiming I own that paper that that circuit is on and it was in my file."[6] Didrickson admitted that the backsheets have been "floating around in public for -- some of them for 40 years."

The backsheets are not trade secrets because they have been released into the public domain. "'Matters of general knowledge in an industry cannot be appropriated by one as his secret.'" *Wissman v. Boucher*, 150 Tex. 326, 330, 240 S.W.2d 278, 280 (Tex. 1951) (quoting Restatement, Torts, ch. 36, p.7)). "Clearly, if an article that is a trade secret becomes known to the community, it loses its status as a trade secret." *Leonard*, 767 S.W.2d at 175. The bell, once rung, cannot be unrung. Once in the public domain, the trade secret must remain in the public domain. *See Kewanee v. Bicron*, 416 U.S. 470, 484 (1974) ("By definition a trade secret has not been placed in the public

---

[6]While Didrickson Associates may have owned the paper on which the ideas were recorded, Didrickson Associates did not necessarily have title to the ideas. Ideas are intangible and exist independent of the physical medium on which they are recorded. As a theft of trade secrets case, the issue in this case is whether McClain stole the ideas, not whether McClain stole the physical medium on which the ideas were recorded.

10

domain."). Although the backsheets may be difficult to find due to their age and obsolete status,[7] the backsheets—once having become public knowledge—remain public knowledge.

In *Weightman v. State*, the Fourteenth District Court of Appeals, in a case for the theft of trade secrets, determined that the evidence was legally insufficient when a drawing which was alleged to have been a trade secret had previously been released to the public. *Weightman v. State*, Nos. 14-93-01094-CR, 14-93-01095-CR, 14-93-01096-CR, 14-93-01097-CR, 1996 Tex. App. LEXIS 5472 (Tex. App.—Houston [14th Dist.] Dec. 12, 1996) (not designated for publication), *aff'd* 975 S.W.2d 621 (Tex. Crim. App. 1998). Similar to *Weightman*, no rational juror could have concluded that the backsheets were trade secrets because the evidence conclusively established the backsheets had been released into the public domain.

## C. Even if the Improvements Were Trade Secrets, McClain Owns the Improvements

The State argues that even if the backsheets themselves were not trade secrets, the improvements to the backsheets (i.e., the notes or tips written on them) were trade secrets. We note it is debatable that the improvements were even trade secrets.[8] Assuming, however, that the

---

[7]David Kellum testified the backsheets "are a hard find."

[8]A trade secret must be "information that is not publicly available or readily ascertainable by independent investigation." *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.—Fort Worth 1987, no writ) (contracts distributed to customers are not trade secrets); *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 586 (Tex. Civ. App.—San Antonio 1966, no writ). Didrickson admitted that all of the information on the set-up sheets was contained on the backsheets. Because the improvements consisted entirely of information that was readily ascertainable from public information, i.e., the backsheets themselves, the improvements may not be trade secrets. We will assume, without

11

improvements are trade secrets, the State failed to prove Didrickson Associates had an exclusive right to the trade secrets. The only improvements identified as being stolen by McClain are the set-up sheets.[9] Didrickson testified that the set-up sheets were McClain's idea and that McClain was the only person who created the set-up sheets.

The State argues that the improvements belong to Didrickson Associates because McClain developed the improvements during the course and scope of his employment. The State cites *Davis v. Alwac Int'l, Inc.*, 369 S.W.2d 797, 802 (Tex. Civ. App.—Beaumont 1963, writ ref'd n.r.e.), for the proposition that the improvements belong to Didrickson Associates. The State's interpretation of *Davis* is an oversimplification of the law which applies. Because the employee in *Davis* was hired to invent, the *Davis* court only recited the rule applicable to employees hired to invent, not to other employees.

---

deciding, that the improvements are trade secrets.

[9]We note Didrickson answered yes when asked whether he or his employees had "made changes, amendments, alterations, something of that nature, to increase [the backsheet's] value." The backsheets introduced at trial had been used by Didrickson Associates since the alleged theft. In our review of the exhibits, we only located two backsheets which had amendments on their face other than highlighting. Exhibit 5Y was substantially modified. An ohm measurement had been added to Exhibit 5EE. The record does not contain any evidence as to when these amendments occurred or who made the amendments. Didrickson testified he could not identify writing on any of the backsheets. The State failed to prove these amendments were in existence at the time McClain stole the backsheets and that McClain did not make these amendments. Without evidence that the amendments were made prior to the alleged theft and that the amendments were not made by McClain, the amendments to the face of the backsheets cannot form the basis of the theft of trade secrets allegations.

12

"That an invention was conceived or developed while the inventor was employed by another does not alone give the employer any right in the invention." *Wommack v. Durham Pecan Co.*, 715 F.2d 962, 965 (5th Cir. 1983). When the trade secret originates from the employee, the employer's ownership rights depends on the nature of the employment relationship which exists. In determining ownership of the trade secret, we must balance competing policies: "the right of a businessman to be protected against unfair competition stemming from the usurpation of his trade secrets and the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is best suited." *Wexler v. Greenberg*, 160 A.2d 430, 434 (Pa. 1959). An employer can prevent an employee from revealing a trade secret which the employee "himself developed during the course of his former employment" only by an express contract restricting its use or by virtue of the special confidential relationship of the parties. *Id.* at 433–34. Because there is no evidence of an express assignment from McClain to Didrickson Associates of McClain's rights to the improvements which are the subject of this case, we must determine whether the employee–employer relationship in this case is of the nature which necessarily implies such an assignment.

As the Beaumont court correctly held in *Davis*, the ownership of the invention, when there is no express contractual assignment, depends on whether the employee was "'employed to invent or devise such improvements.'"[10] *Davis*, 369 S.W.2d at 802 (quoting *Standard Parts Co. v. Peck*,

---

[10]We note that *Davis* concerned patent law and did not involve trade secrets. Although we are not aware of any Texas caselaw applying this doctrine to trade secrets, secondary authority indicates the principle is applicable to trade secrets as well as patentable inventions. *See* 5 MILGRIM ON TRADE SECRETS § 5.02 (Lexis 2008); 13 William V. Dorsaneo, III, and Herbert J. Hammond,

264 U.S. 52, 58 (1924)); *see Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996). If an employee was not hired to invent or devise the improvements, the employee is entitled to ownership of the improvements. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933); *see Wommack*, 715 F.2d at 967.

The State did not establish that McClain was hired to design improvements to the backsheets. To the contrary, the State established that McClain, the holder of two associate degrees, was not hired to design improvements. Didrickson testified that McClain's responsibility was responding to inquiries from customers, to test and certify cards, and to repair defective cards. Didrickson admitted that the set-up sheets had been McClain's idea and that all of them were produced by McClain. Absent an express assignment, the improvements did not become the exclusive property of Didrickson Associates.

We note that Didrickson Associates may have a "shop right" to the improvements as a matter of equity. An employer has a shop right when "the invention was developed by his employee during the employer's time or with the assistance of the employer's property or labor." *Wommack*, 715 F.2d at 965. A "shop right" is a nonexclusive right to practice the invention. *Dubilier Condenser*, 289 U.S. at 188. At best, Didrickson Associates has a "shop right" to the improvements or set-up sheets—a nonexclusive right of ownership.

---

*Texas Litigation Guide* § 200.04 (Lexis 2008).

14

As a nonexclusive right, Didrickson Associates cannot, by virtue of McClain's shop right, prohibit him from using the improvements which he developed. Even if the improvements or set-up sheets were trade secrets, McClain owns the improvements subject to Didrickson Associates' possible shop right. Because there was neither any evidence of an express assignment from McClain to Didrickson Associates nor evidence that McClain was hired specifically to design or invent, the evidence is legally insufficient that McClain committed theft of trade secrets.

## IV.    Conclusion

Although McClain may have obtained this information wrongfully, McClain is not guilty of theft of trade secrets.[11] As information previously placed in the public domain, the backsheets are not trade secrets and even if the set-up sheets had been trade secrets, the State failed to prove that Didrickson Associates had the exclusive ownership rights to the improvements contained in the set-up sheets. Absent an express assignment of McClain's rights or evidence that McClain was hired for the purpose of developing trade secrets, McClain owned the improvements, if any, contained in the set-up sheets, subject to any shop rights held by Didrickson Associates. The evidence is legally insufficient. Because the evidence is legally insufficient, it is unnecessary to decide McClain's fourth point of error regarding error in the jury charge.

---

[11]We are not saying there is no form of legal redress available to Didrickson Associates for McClain's actions—merely that the State has failed to prove McClain was guilty of theft of trade secrets.

15

We reverse the judgment of the trial court and render a judgment of acquittal.


Bailey C. Moseley
Justice

Date Submitted:     September 10, 2008
Date Decided:       October 17, 2008

Publish