**RURAL PENNINGTON COUNTY TAX ASSOCIATION, for and in behalf of the taxpayers of Pennington County, South Dakota, and John McMahon, Plaintiffs and Appellants,**

v.

**Jack C. DIER, Defendant and Appellee.**

**No. 18289.**

Supreme Court of South Dakota.

Considered on Briefs Dec. 3, 1993.

Decided May 11, 1994.

John Peterson and Rick Johnson, Johnson, Eklund, Nicholson, Dougherty & Abourezk, Gregory, for plaintiffs and appellants.

Gregory A. Eiesland, Quinn, Eiesland, Day & Barker, Rapid City (Lois A. Lofgren, Legal Intern, on brief), for defendant and appellee.

PER CURIAM.

John McMahon (McMahon) and the Rural Pennington County Tax Association appeal a judgment dismissing their action against Jack Dier (Dier) for the recovery of certain royalties and settlement proceeds he re-

ceived in connection with the development of a computer program. We affirm.

## FACTS

In 1979, Dier was employed by Pennington County South Dakota as its county highway superintendent. In early 1983, the county retained a consulting firm to ascertain the computer needs of the highway department. Bids were solicited according to the specifications of the consulting firm and a contract was ultimately awarded to MCS Group, Inc. (MCS). Under the terms of the contract, the county acquired a "perpetual, non-exclusive, not-transferable and not-personal license" to use the operating system software. The contract also acknowledged the ability of MCS to "sell, license or lease the Application Software to other users."

The software program MCS provided the county was not specifically designed for use by highway departments. No such program was available at that time. Thus, in order to meet the bid specifications, MCS had to find a generic software program that it could adapt to fit the needs of the highway department. The county was put on notice that MCS planned to market the software program it ultimately developed to other county highway departments. Over time, MCS installed the computer system, made the necessary program adaptations and, in that process, developed a software program that became known as C.H.R.I.S., an acronym for County Highway Resources Information Systems.

Given his position as highway superintendent, Dier played a part in the evolution of the C.H.R.I.S. program. Necessity required him to point out problems with the system so that MCS could make the adapted computer program perform the various tasks for which it was acquired. Through his past employment experience in the construction industry, Dier had also acquired a thorough working knowledge of the use of spreadsheets as a management tool. As C.H.R.I.S. developed, Dier would extract data from the C.H.R.I.S.

system and format it into various spreadsheets that he used to assist him in carrying out his job responsibilities.

Through the working relationship established between MCS and Dier, MCS became aware of the spreadsheets Dier was using. MCS approached Dier and requested his assistance in developing software based on these spreadsheets that could be marketed to counties throughout the country. MCS provided Dier with computers, equipment and supplies that he could use to develop the new software. Dier also obtained the assistance of his wife, a bookkeeper knowledgeable in the use of computers, and set up an office in one of the bedrooms of his home. Over the course of several months, the Diers spent their evenings and weekends working on a program that would ultimately be called C.H.R.I.S.–MATE. C.H.R.I.S.–MATE was completed in early 1986. In January 1986, MCS and Dier entered into an independent contractor's agreement establishing ownership and marketing rights, royalties, and the relationship between MCS and Dier in regard to the new computer program.

MCS was subsequently able to market C.H.R.I.S.–MATE with sales that paid Dier some $17,000 in royalties. After approximately two years, there was a change in management at MCS. The new management felt that Dier was being overpaid and attempted to change the royalty terms of Dier's contract. Dier filed suit to require MCS to abide by the terms of the original contract. The litigation was settled out of court and Dier was paid a cash settlement in the neighborhood of $52,000.

Pennington County attempted to intervene in the litigation between Dier and MCS to receive part of Dier's royalties. That attempt was unsuccessful. In 1990, McMahon and his taxpayer group commenced the present action against Dier in the belief that Pennington County was entitled to Dier's royalties and settlement proceeds from MCS.[1] A trial to the court was held and the trial court entered its findings of fact, conclu-

---

1. Because it has never been raised, briefed or argued, we do not address the question of whether res judicata or collateral estoppel resulting from Pennington County's unsuccessful attempt to intervene in Dier's suit against MCS might also have prohibited the taxpayer group's present action against Dier.

sions of law and judgment dismissing the taxpayer suit on the merits and with prejudice. This appeal followed.

## ISSUE

DID THE TRIAL COURT ERR IN ITS DETERMINATION THAT PENNINGTON COUNTY HAD NO INTEREST IN DIER'S ROYALTIES OR SETTLEMENT PROCEEDS FROM MCS?

SDCL 4–3–2 provides:

No county or state officer for whose services a salary is provided by law shall receive any compensation for his services other than such salary. All fees received by him shall be paid into the county or state treasury, as the case may be, not later than the time set by § 7–9–17. This section shall not be so construed as to affect in any manner any officer who receives no salary other than the fees paid for his services.

SDCL 60–2–10 provides:

Everything which an employee acquires by virtue of his employment, lawfully or unlawfully, during or after the term of employment belongs to the employer, excepting any compensation due the employee.

McMahon and his taxpayer group argue that SDCL 4–3–2 and SDCL 60–2–10 require Dier to pay any monies he received from the sale of C.H.R.I.S. or C.H.R.I.S.–MATE, including settlement proceeds, into the Pennington County treasury. Accordingly, they contend that the trial court erred in determining that Pennington County had no interest in Dier's royalties or settlement proceeds from MCS. However, we agree with the decision of the trial court.

■ The construction of a statute is a question of law and the decision below is fully reviewable without deference to the decision of the trial court. *Nelson v. School Bd. of Hill City S.D.,* 459 N.W.2d 451 (S.D.1990). The most important rule of statutory construction is to determine and give effect to the intention of the legislature. *Id.* Legislative intent is derived primarily from the language expressed in the statute. *Id.* "The intent of a statute must be derived from the statute as a whole, from its language, and by giving it its plain, ordinary and popular meaning." *Bryant v. Butte County,* 457 N.W.2d 467, 470 (S.D.1990).

■ By its explicit terms, SDCL 4–3–2 prohibits a county officer such as Dier from receiving any compensation "for his services" other than his salary. This Court has never had an opportunity to interpret this language. However, the Attorney General has issued a number of opinions interpreting the provision in various factual scenarios. In 1968, the Attorney General issued an opinion on the question of whether a county judge appointed as indigent defense counsel in a criminal case could retain his court appointed attorney fees or whether the judge was required to deposit those fees into the county treasury. The Attorney General concluded:

Such fees a public officer receives (in this case the County Judge) that the statute states must be deposited with the County Treasurer, *are fees [received] by virtue of such public office, and do not contemplate fees received* from public funds, in pursuance to statute *for services performed,* not by virtue of such public office but *for the performance of duties,* not incompatible with and *outside of and in addition to such official duties.*

Op. Att'y Gen. 476, 479 (1967–68) (emphasis added). More recently, the Attorney General issued an opinion as to whether county officials summoned for jury duty were entitled to retain their jury fees. Consistent with his earlier opinions, the Attorney General concluded:

It is my opinion, based upon a review of the above statutes, that all county officials and employees are entitled to the statutorily mandated fees and expenses while performing jury duty. All of the statutory restrictions to receipt of fees in excess of salary in my opinion are inapplicable. The reason for this determination is that there is no connection between services a person performs as a juror and the services a county employee or official is hired or elected to perform. *Restrictions such as those contained in SDCL 4–3–2* and SDCL 7–7–17 *in my opinion only apply to fees generated from work-related services.*

Op. Att'y Gen. 212, 214 (1985–86) (emphasis added).

Opinions of the Attorney General are, of course, not binding on this Court. They are, however, "entitled to weight in gleaning the legislature's intention." *Application of Farmers State Bank*, 466 N.W.2d 158, 163 (S.D.1991). In this instance, the Attorney General's interpretations of SDCL 4–3–2 are clearly consistent with the plain language of the statute restricting a county officer's receipt of additional compensation, "for his services." Therefore, resolution of the taxpayer group's contentions under SDCL 4–3–2 requires that we determine whether MCS's compensation of Dier for his development of C.H.R.I.S.–MATE constituted compensation "for his services" in addition to the salary already paid to him by the county.

The county hired Dier and compensated him for his services *as its county highway superintendent*. MCS compensated Dier for his services in developing a computer program. If Dier had been hired by the county as a computer programmer so that "his services" for the county included the development of a computer program, we might be able to find a violation of SDCL 4–3–2. However, that is not what occurred in this case. Although Dier's management responsibilities as highway superintendent were undoubtedly extensive, we find nothing in the record establishing those responsibilities included the development of a computer program.

Dier's management responsibilities did naturally require that he play a role in MCS's development of the C.H.R.I.S. program. As MCS made the necessary adaptations to insure that the modified program fulfilled the purposes for which the county acquired it, Dier, as highway superintendent, was obviously required to point out problems with the system so that MCS could make the program work. In this, however, we see Dier acting no differently than any purchaser of a new appliance who keeps calling a repairman back until the product performs its intended purpose. This did not, however, transform Dier into a computer programmer for the county any more than calling the copy machine repairman or typewriter repairman would have transformed him into a county employee responsible for fulfilling those functions.

Dier's use of the spreadsheets he later developed into the C.H.R.I.S.–MATE program leads us to no different conclusion. Dier made extensive use of spreadsheets as a management tool. Dier had acquired his working knowledge of the use of spreadsheets through his past employment experience in the construction industry. The record establishes that as MCS refined C.H.R.I.S. for the highway office's use, Dier would extract data from the system and format it into various spreadsheets that he used to assist him in carrying out his various management responsibilities. For example, Dier extracted information from the payroll program and set it up on a spreadsheet that permitted him to monitor his employees' sick leave. Apparently, Dier made similar use of spreadsheets in connection with other management aspects of his job. However, it is important to recognize that nothing in the record establishes that part of Dier's formal job responsibilities included the development, production or maintenance of the computerized spreadsheets he later turned into C.H.R.I.S.–MATE. Dier simply utilized them as a management tool.

After MCS approached him, Dier took the forms and spreadsheets he was using and, with the aid of his wife, turned them into the C.H.R.I.S.–MATE program. In that effort, the two expended their own time in their own home utilizing equipment and supplies provided by MCS.[2] Nothing in the record establishes that county resources were utilized to any degree of significance. Based on these facts and the plain language of SDCL

---

2. This merely reenforces our conclusion that Dier's job responsibilities did not include the development of a computer program. If they did, why was it necessary for Dier to obtain the assistance of his wife and work in the evening hours in an office in his home? Moreover, if the spreadsheets Dier utilized were essential to operation of his office, why were they not developed by MCS as a part of the C.H.R.I.S. program under the terms of its contract with the county? Surely MCS was not paying Dier out of the kindness of its heart to develop something it was already obligated to produce.

4–3–2, we find no error in the trial court's determination that Pennington County had no interest in the royalties or settlement proceeds Dier derived as a result of his development of the C.H.R.I.S.–MATE program.[3]

■ The taxpayer group's argument under SDCL 60–2–10 leads to no different conclusion. The plain language of SDCL 60–2–10 provides that everything an employee acquires "by virtue of his employment," except his compensation, belongs to the employer. This Court applied the forerunner of this statute in *Brown County v. Zerr*, 67 S.D. 516, 295 N.W. 289 (1940). In *Brown County*, a county employee responsible for renting trucks for the county and fixing the rental fees made an agreement with an automobile dealer for his own purchase of a truck. The terms of the agreement required the employee to see to it that the county rented the truck. The rental bills were submitted to the county by the automobile dealer. However, the rental money received was applied, first, to the operating costs of the truck and, the balance, to the contract price for the employee's purchase of the truck. After approximately seven months, the employee paid the balance due on the contract price and title was transferred from the automobile dealer to an agent acting for the county employee. The county subsequently commenced an action for recovery of possession of the truck and a judgment was entered for the county employee. This court reversed relying on the provisions of then SDC 17.0308, the precursor to SDCL 60–2–10. In reaching its conclusion, this court observed:

> The vice of such transactions is that the interests of the agent are adverse to the interests of his principal ... 'It is the policy of the law to remove all temptation in an agent to be influenced by his own interest to the detriment of his principal.' In this case it was to the interest of the

County to rent the truck for as little as it reasonably could. On the other hand, it was to the interest of [the employee] to have the County pay a high rent for the truck; for the higher the rent paid by the County, the sooner the truck would be paid for and [the employee] would be the owner thereof.

*Brown County*, 67 S.D. at 521, 295 N.W. at 291 (citations omitted).

Relying on *Brown County, supra*, McMahon and his taxpayer group contend:

> [s]imilarly, county monies were used and paid to Dier for the development of C.H.R.I.S. and the C.H.R.I.S.–MATE templates. Dier, by way of secret agreement received further monies for developing these valuable commodities. Dier did not receive permission from the County Commission to deal or contract with MCS on C.H.R.I.S. or C.H.R.I.S.–MATE.

The facts of this case, however, do not support this contention. Dier was *never* paid for work developing C.H.R.I.S., either by the county or MCS. Rather, he was paid by the county to act as its highway superintendent. In his capacity as superintendent, he was necessarily required to advise MCS as it developed C.H.R.I.S. to fit the particular needs of his office and the requirements of the county. For that work, he received no compensation from MCS. Dier *was* paid by MCS to develop C.H.R.I.S.–MATE. However, as previously discussed, C.H.R.I.S.–MATE, in contrast with C.H.R.I.S., was not developed to meet the specific needs of the county or the county highway office. Rather, C.H.R.I.S.–MATE was based on certain personal forms and spreadsheets Dier had developed and utilized as tools to assist him in carrying out his management responsibilities as county highway superintendent. Moreover, C.H.R.I.S.–MATE was developed dur-

---

3. We liken Dier's invention of C.H.R.I.S.–MATE to a clerk in an old time general store who, constantly being required to total the prices of goods sold, goes home one night and invents an adding machine to assist him with his duties. The clerk was hired by the store owner to total the prices of goods sold, not to invent an adding machine. Here, Dier was hired by the county to serve as its highway superintendent, not to invent

a computer program. Moreover, under our hypothetical, the question in this case would be, "does the owner of the store have royalty rights in the adding machine invented by the clerk?" Under authorities subsequently cited in this decision, the answer is clearly, "no." Thus, we reach the same conclusion with regard to the county's royalty interests in C.H.R.I.S.–MATE.

ing Dier's personal time, at home, with the assistance of his wife and with equipment supplied by MCS, not the county.

The foregoing facts fail to reflect any of the evils condemned by this court in *Brown County, supra.* In that case, the county employee used county assets (i.e., the rent money paid for a truck) to acquire a personal asset (i.e., the truck). Further, a conflict clearly existed between the county's interest in a low rental payment and the employee's interest in a high rental payment. There is no similar misappropriation of assets or conflict of interest in the present case. The only similar allegation whatsoever is that Dier might have used some county resources to develop the C.H.R.I.S.–MATE programming. However, as to that allegation, the trial court found as a fact that, "CHRIS–MATE was not invented or developed with County equipment, County employees or to any great extent, on County time."

Various recitations of the rules applicable to determining an employer's entitlement to the inventions of his employee can be found. *See, e.g., United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933); *Wommack v. Durham Pecan Co., Inc.,* 715 F.2d 962 (5th Cir.1983); *Barlow & Seelig Mfg. Co. v. Patch,* 232 Wis. 220, 286 N.W. 577 (1939). However, the rules are perhaps best summarized in the following passage:

> In the absence of an express or implied agreement as to the ownership of inventions of the employee, the employer from the mere fact of a general employment has no exclusive rights to the inventions of his employee, even though in order to perfect his invention the employee uses his employer's property, or receives the assistance of others in the employer's pay, or takes time which should have been given to his employer's business.
>
> The fact of employment also does not give an employer exclusive rights to the inventions of an employee even though it can be said that the employee's inventive power was incited by knowledge necessarily derived from his employment, or that, by reason of his rendition of services in the course of his employment, he may have so enhanced his mechanical skill, scientific knowledge, and inventive faculties as to enable him to develop and perfect an idea into patentable material.
>
> There is no difference between the government and any other employer in this respect. Under such circumstances a patent obtained by an employee need not be assigned to the employer.

30 C.J.S. *Employer–Employee* § 117 (1992).

Here, we fail to perceive any impropriety in Dier's actions. No express or implied agreement as to Pennington County's ownership of inventions developed by Dier has been established. The county got precisely what it bargained for from both Dier and MCS, i.e., Dier's services as county highway superintendent and a computer system for its highway office. In fact, the county got more than it bargained for. Due to Dier's extra efforts, it obtained the free use and benefits of the forerunner of the C.H.R.I.S.–MATE computer program as well as the consultation of its creator.

Based upon the above reasoning, we find no violation of SDCL 4–3–2 or SDCL 60–2–10 by Dier in deriving benefits from the sale of C.H.R.I.S.–MATE.[4]

Affirmed.

MILLER, C.J., and WUEST, SABERS and AMUNDSON, JJ., participating.

HENDERSON, J., disqualified.

---

4. In this vein, we note that no argument or allegations have been raised concerning Dier's violation of any county personnel rules prohibiting outside employment by county employees. It is important to note that this is not an appeal of an employee disciplinary proceeding for violation of such a rule. The issue in this appeal is confined to the county's interest in the royalties and settlement proceeds an employee derived from his invention. Thus we give no consideration to the propriety of Dier's outside employment with MCS.