In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00168-CR
______________________________


AARON RAY HIGGINBOTHAM, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 30772-A


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Ross


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Aaron Ray Higginbotham appeals from his conviction by a juryâand mandatory life 
sentenceâfor capital murder. He contends the trial court erred in admitting testimony of
his oral statements to the police while he was under arrest. Because Higginbotham failed
to preserve this issue for our review, there is no error, and we affirm the judgment.
Â Â Â Â Â Â Â Â Â Â The evidence, including Higginbotham's own testimony, established that he and
Michael Kay caught a ride with Michael Hendrix, in Hendrix's pickup truck, from a strip club
in Kilgore; that they went to a secluded location near the Sabine River; that Higginbotham
and Kay beat Hendrix unconscious and threw him in the river; and that they then left, taking
Hendrix's truck. 
Â Â Â Â Â Â Â Â Â Â Higginbotham gave four written statements to police in which he admitted his
complicity in the crime. Those statements were admitted into evidence. Higginbotham
also took the police to the location where he and Kay had assaulted Hendrix and where
they threw him in the river. Higginbotham made a number of oral statements to the police
during this trip. The police recovered blood from the scene of the assault, and they
recovered Hendrix's body in the river near where Higginbotham told them he and Kay had
thrown it.
Â Â Â Â Â Â Â Â Â Â Higginbotham contends only that the admission of testimony about his oral
statements was error. He did not object at trial to the admission of this testimony. His
pretrial motion to suppress did, however, ask that both written and oral statements be
suppressed. When a pretrial motion to suppress evidence is overruled, a defendant need
not subsequently object at trial to the same evidence in order to preserve error on appeal. 
Wyle v. State, 777 S.W.2d 709, 715 n.5 (Tex. Crim. App. 1989); Mayfield v. State, 152
S.W.3d 829, 831 (Tex. App.âTexarkana 2005, pet. ref'd); see Tex. R. Evid. 103(a)(1).
Â Â Â Â Â Â Â Â Â Â At the hearing on Higginbotham's motion to suppress, some of the officers testified
concerning Higginbotham leading them to where Hendrix's body was found, but no
questions were asked concerning the specific content of the officers' conversations with
Higginbotham on that occasion; neither was there any attempt made to raise any issues
about the admissibility of testimony concerning those conversations. The entirety of the
focus of the hearing was on the four written statements. When the trial court ruled on the
admissibility of the statements, it did so after hearing the testimony concerning the
circumstances surrounding the taking of the written statements and after hearing argument
by both defense and prosecution explaining their reasons as to why the documents were
or were not admissible. The court ruled the statements admissible. Higginbotham now
contends the testimony of Detective Tom Watson concerning the oral, in custodial,
statements Higginbotham made while leading the officers to where he and Kay had
disposed of Hendrix's body, was improperly admitted. 
Â Â Â Â Â Â Â Â Â Â We note that Higginbotham has argued in his appellate brief that the oral statements
were inadmissible because the context of those statements was coercive, i.e., he was in
a police car, surrounded by police officers, in the river bottoms at night, looking for a body. 
However, as noted above, Higginbotham did not argue these matters at the suppression
hearing or at the time this testimony was offered at trial. He cannot now raise those
arguments for the first time on appeal. See Hargrove v. State, 162 S.W.3d 313, 324 (Tex.
App.âFort Worth 2005, pet. filed) (holding that failure to raise issues clearly at
suppression hearing preserves nothing for appellate review); Judd v. State, 923 S.W.2d
135, 138 (Tex. App.âFort Worth 1996, pet. ref'd) (emphasizing that any objection at trial
that differs from complaint on appeal preserves nothing for review); McNairy v. State, 777
S.W.2d 570, 573 (Tex. App.âAustin 1989), aff'd on other grounds, 835 S.W.2d 101 (Tex.
Crim. App. 1991) (acknowledging that contention presented on appeal must be same as
that presented to trial court at pretrial hearing on motion to suppress evidence). 
Â Â Â Â Â Â Â Â Â Â Because of the absence at the suppression hearing of any argument concerning
these oral statements, and because these statements were admitted at trial without
objection, we conclude that the issue now raised for the first time on appeal has not been
preserved for our review.
Â Â Â Â Â Â Â Â Â Â Even if the alleged error had been preserved, the issue in determining whether
evidence should be suppressed is a constitutional one. Thus, we would be required to
reverse unless we determine beyond a reasonable doubt the error did not contribute to the
appellant's conviction or punishment. Tex. R. App. P. 44.2(a). In assessing the likelihood
that the jury's decision was adversely affected by the error, we are to consider everything
in the record, including any testimony or physical evidence admitted for the jury's
consideration, the nature of the evidence supporting the verdict, the character of the
alleged error and its connection with other evidence, and whether the state emphasized
the error. See Motilla v. State, 78 S.W.3d 352, 357â58 (Tex. Crim. App. 2002); Malone
v. State, 163 S.W.3d 785, 800 (Tex. App.âTexarkana 2005, pet. filed). We would,
therefore, assess the probable weight a juror would place on the improperly admitted
statements. To do this in the instant case, we must assess the independent proof of
Higginbotham's participation in the alleged offense. See Jones v. State, 119 S.W.3d 766,
778 (Tex. Crim. App. 2003). 
Â Â Â Â Â Â Â Â Â Â In making that assessment, we have four separate written confessions by
Higginbotham that were admitted into evidence. In the longest, typewritten statement, he
admitted in detail everything mentioned in the oral statements. He personally testified at
trial that he believed Hendrix was hurt "pretty bad" when they put him in the back of the
truck, and that Higginbotham and Kay threw Hendrix in the river. Forensic examination
found Hendrix's blood in the truck and on Higginbotham's clothes and a shoe. 
Â Â Â Â Â Â Â Â Â Â Higginbotham argues that Watson's testimony concerning the oral statements was
harmful because it showed his mental condition at the time as being more coherent than
that reflected by his disjointed state of mind at the time of trial. However, his efforts to be
of assistance and to tell the truth were a centerpiece of the defense strategy at trial, which,
under these facts, was an attempt to show that he was not the main actor in the
commission of the offense and thereby avoid a capital murder conviction. With this trial
strategy, it is difficult to perceive how a recounting of the officers' efforts to find Hendrix's
body with Higginbotham's assistance was harmful to Higginbotham.
Â Â Â Â Â Â Â Â Â Â Finally, the oral statements about which Watson testified were admissible evidence
pursuant to Tex. Code Crim. Proc. Ann. art. 38.22, Â§ 3(c) (Vernon 2005). Such
statements led the police to evidence (Hendrix's body) they did not have, and contained
assertions of facts and circumstances that were found to be true and that established
Higginbotham's guilt. 
Â Â Â Â Â Â Â Â Â Â For these reasons, Higginbotham's sole point of error is overruled.
Â Â Â Â Â Â Â Â Â Â We affirm the judgment.


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â September 20, 2005
Date Decided:Â Â Â Â Â Â Â Â Â October 4, 2005

Do Not Publish



n
and Didrickson had keys. Although there was no formal nondisclosure agreement as a part of
McClain's employment, (4) Didrickson testified that he had explained to McClain the need for secrecy. 

 The record, though, also contains some contrary evidence. As pointed out by McClain,
Didrickson Associates did not diligently protect the backsheets. Didrickson admitted on cross-examination that he would share the backsheets with customers and on at least one occasion had
shared a backsheet with a competitor. Although most of the backsheets were kept locked in the
filing cabinet, Didrickson admitted that the backsheets which were in most common use were kept
in a binder which was not secured. 

 We are unable to reach the high level of skepticism required to disturb the jury's finding on
this point. Didrickson's credibility is the sole province of the jury. The contrary evidence is not
strong enough to overcome the deference we grant to the jury. The evidence of security measures
is sufficient for the jury to have concluded that Didrickson Associates took measures to ensure that
the information remained secret.

 B. The Backsheets Are Not Trade Secrets

 At trial, the State argued the backsheets (5) are trade secrets because they contain technical
information and have value. In order for a person to commit theft of a trade secret, the information
taken must be a trade secret. The simple fact that information has value does not make that
information a trade secret. McClain argues the backsheets are not trade secrets because they are
public information. 

 The record conclusively establishes the backsheets were public knowledge. Didrickson
admitted the backsheets had been placed in the public domain by GE, the original publisher. When
asked, "[Y]ou're not claiming an intellectual property right or the ownership of the trade secret that
is labeled proprietary information of General Electric Company, are you? You're not the sole --,"
Didrickson testified, "I did not design that circuit. I'm not claiming I own the design of that circuit. 
I'm claiming I own that paper that that circuit is on and it was in my file." (6) Didrickson admitted that
the backsheets have been "floating around in public for -- some of them for 40 years." 

 The backsheets are not trade secrets because they have been released into the public domain. 
"'Matters of general knowledge in an industry cannot be appropriated by one as his secret.'" Wissman
v. Boucher, 150 Tex. 326, 330, 240 S.W.2d 278, 280 (Tex. 1951) (quoting Restatement, Torts,
ch.Â 36, p.7)). "Clearly, if an article that is a trade secret becomes known to the community, it loses
its status as a trade secret." Leonard, 767 S.W.2d at 175. The bell, once rung, cannot be unrung. 
Once in the public domain, the trade secret must remain in the public domain. See Kewanee v.
Bicron, 416 U.S. 470, 484 (1974) ("By definition a trade secret has not been placed in the public
domain."). Although the backsheets may be difficult to find due to their age and obsolete status, (7)
the backsheets--once having become public knowledge--remain public knowledge.

 In Weightman v. State, the Fourteenth District Court of Appeals, in a case for the theft of
trade secrets, determined that the evidence was legally insufficient when a drawing which was
alleged to have been a trade secret had previously been released to the public. Weightman v. State,
Nos. 14-93-01094-CR, 14-93-01095-CR, 14-93-01096-CR, 14-93-01097-CR, 1996 Tex. App.
LEXIS 5472 (Tex. App.--Houston [14th Dist.] Dec. 12, 1996) (not designated for publication), aff'd
975 S.W.2d 621 (Tex. Crim. App. 1998). Similar to Weightman, no rational juror could have
concluded that the backsheets were trade secrets because the evidence conclusively established the
backsheets had been released into the public domain. 

 C. Even if the Improvements Were Trade Secrets, McClain Owns the
Improvements


 The State argues that even if the backsheets themselves were not trade secrets, the
improvements to the backsheets (i.e., the notes or tips written on them) were trade secrets. We note
it is debatable that the improvements were even trade secrets. (8) Assuming, however, that the
improvements are trade secrets, the State failed to prove Didrickson Associates had an exclusive
right to the trade secrets. The only improvements identified as being stolen by McClain are the
set-up sheets. (9) Didrickson testified that the set-up sheets were McClain's idea and that McClain was
the only person who created the set-up sheets. 

 The State argues that the improvements belong to Didrickson Associates because McClain
developed the improvements during the course and scope of his employment. The State cites Davis
v. Alwac Int'l, Inc., 369 S.W.2d 797, 802 (Tex. Civ. App.--Beaumont 1963, writ ref'd n.r.e.), for the
proposition that the improvements belong to Didrickson Associates. The State's interpretation of
Davis is an oversimplification of the law which applies. Because the employee in Davis was hired
to invent, the Davis court only recited the rule applicable to employees hired to invent, not to other
employees. 

 "That an invention was conceived or developed while the inventor was employed by another
does not alone give the employer any right in the invention." Wommack v. Durham Pecan Co., 715
F.2d 962, 965 (5th Cir. 1983). When the trade secret originates from the employee, the employer's
ownership rights depends on the nature of the employment relationship which exists. In determining
ownership of the trade secret, we must balance competing policies: "the right of a businessman to
be protected against unfair competition stemming from the usurpation of his trade secrets and the
right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is
best suited." Wexler v. Greenberg, 160 A.2d 430, 434 (Pa. 1959). An employer can prevent an
employee from revealing a trade secret which the employee "himself developed during the course
of his former employment" only by an express contract restricting its use or by virtue of the special
confidential relationship of the parties. Id. at 433-34. Because there is no evidence of an express
assignment from McClain to Didrickson Associates of McClain's rights to the improvements which
are the subject of this case, we must determine whether the employee-employer relationship in this
case is of the nature which necessarily implies such an assignment. 

 As the Beaumont court correctly held in Davis, the ownership of the invention, when there
is no express contractual assignment, depends on whether the employee was "'employed to invent
or devise such improvements.'" (10) Davis, 369 S.W.2d at 802 (quoting Standard Parts Co. v. Peck,
264 U.S. 52, 58 (1924)); see Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403, 407 (Fed. Cir.
1996). If an employee was not hired to invent or devise the improvements, the employee is entitled
to ownership of the improvements. United States v. Dubilier Condenser Corp., 289 U.S. 178 (1933);
see Wommack, 715 F.2d at 967. 

 The State did not establish that McClain was hired to design improvements to the backsheets. 
To the contrary, the State established that McClain, the holder of two associate degrees, was not
hired to design improvements. Didrickson testified that McClain's responsibility was responding
to inquiries from customers, to test and certify cards, and to repair defective cards. Didrickson
admitted that the set-up sheets had been McClain's idea and that all of them were produced by
McClain. Absent an express assignment, the improvements did not become the exclusive property
of Didrickson Associates.

 We note that Didrickson Associates may have a "shop right" to the improvements as a matter
of equity. An employer has a shop right when "the invention was developed by his employee during
the employer's time or with the assistance of the employer's property or labor." Wommack, 715 F.2d
at 965. A "shop right" is a nonexclusive right to practice the invention. Dubilier Condenser, 289
U.S. at 188. At best, Didrickson Associates has a "shop right" to the improvements or set-up
sheets--a nonexclusive right of ownership. 

 As a nonexclusive right, Didrickson Associates cannot, by virtue of McClain's shop right,
prohibit him from using the improvements which he developed. Even if the improvements or set-up
sheets were trade secrets, McClain owns the improvements subject to Didrickson Associates'
possible shop right. Because there was neither any evidence of an express assignment from McClain
to Didrickson Associates nor evidence that McClain was hired specifically to design or invent, the
evidence is legally insufficient that McClain committed theft of trade secrets. 

IV. Conclusion

 Although McClain may have obtained this information wrongfully, McClain is not guilty of
theft of trade secrets. (11) As information previously placed in the public domain, the backsheets are
not trade secrets and even if the set-up sheets had been trade secrets, the State failed to prove that
Didrickson Associates had the exclusive ownership rights to the improvements contained in the set-up sheets. Absent an express assignment of McClain's rights or evidence that McClain was hired
for the purpose of developing trade secrets, McClain owned the improvements, if any, contained in
the set-up sheets, subject to any shop rights held by Didrickson Associates. The evidence is legally
insufficient. Because the evidence is legally insufficient, it is unnecessary to decide McClain's fourth
point of error regarding error in the jury charge. 

 We reverse the judgment of the trial court and render a judgment of acquittal. 




 Bailey C. Moseley

 Justice


Date Submitted: September 10, 2008

Date Decided: October 17, 2008


Publish

1. This case has been transferred to this Court as part of the Texas Supreme Court's docket
equalization program.
2. Didrickson testified the "aero-derivative gas turbines" are gas turbines located on airplanes
which are "directly coupled to their compressors and their gears." 
3. Because tangible property, which consists of physical property composed of atoms, can
occupy only one place at any given time, the right to exclude others lies at the core of the traditional
Western concept of property. Robert P. Merges, et al., Intellectual Property in the New
Technological Age, 2 (2d ed. 2000). Intellectual property, as intangible property, does not have
this inherent characteristic of exclusivity. Id. The exchange of ideas does not deprive the original
owner of the idea. Id. 
4. Further, the Texas Court of Criminal Appeals has noted there is an implied duty of
confidentiality by virtue of the employment relationship even in the absence of an express written
agreement. Schalk, 823 S.W.2d at 640. "Although this duty does not bar use of general knowledge,
skill, and experience, it prevents the former employee's use of confidential information or trade
secrets acquired during the course of employment." T-N-T Motorsports, Inc. v. Hennessey
Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App.--Houston [1st Dist.] 1998, no pet.).
5. The backsheets introduced as exhibits were from the files of Didrickson Associates. 
Didrickson testified the backsheets were those which McClain had removed and later returned. 
6. While Didrickson Associates may have owned the paper on which the ideas were recorded,
Didrickson Associates did not necessarily have title to the ideas. Ideas are intangible and exist
independent of the physical medium on which they are recorded. As a theft of trade secrets case, the
issue in this case is whether McClain stole the ideas, not whether McClain stole the physical medium
on which the ideas were recorded.
7. David Kellum testified the backsheets "are a hard find." 
8. A trade secret must be "information that is not publicly available or readily ascertainable by
independent investigation." Numed, Inc. v. McNutt, 724 S.W.2d 432, 435 (Tex. App.--Fort Worth
1987, no writ) (contracts distributed to customers are not trade secrets); SCM Corp. v. Triplett Co.,
399 S.W.2d 583, 586 (Tex. Civ. App.--San Antonio 1966, no writ). Didrickson admitted that all
of the information on the set-up sheets was contained on the backsheets. Because the improvements
consisted entirely of information that was readily ascertainable from public information, i.e., the
backsheets themselves, the improvements may not be trade secrets. We will assume, without
deciding, that the improvements are trade secrets.
9. We note Didrickson answered yes when asked whether he or his employees had "made
changes, amendments, alterations, something of that nature, to increase [the backsheet's] value." The
backsheets introduced at trial had been used by Didrickson Associates since the alleged theft. In our
review of the exhibits, we only located two backsheets which had amendments on their face other
than highlighting. Exhibit 5Y was substantially modified. An ohm measurement had been added
to Exhibit 5EE. The record does not contain any evidence as to when these amendments occurred
or who made the amendments. Didrickson testified he could not identify writing on any of the
backsheets. The State failed to prove these amendments were in existence at the time McClain stole
the backsheets and that McClain did not make these amendments. Without evidence that the
amendments were made prior to the alleged theft and that the amendments were not made by
McClain, the amendments to the face of the backsheets cannot form the basis of the theft of trade
secrets allegations.
10. We note that Davis concerned patent law and did not involve trade secrets. Although we
are not aware of any Texas caselaw applying this doctrine to trade secrets, secondary authority
indicates the principle is applicable to trade secrets as well as patentable inventions. See 5 Milgrim
on Trade Secrets § 5.02 (Lexis 2008); 13 William V. Dorsaneo, III, and Herbert J. Hammond,
Texas Litigation Guide Â§ 200.04 (Lexis 2008). 
11. We are not saying there is no form of legal redress available to Didrickson Associates for
McClain's actions--merely that the State has failed to prove McClain was guilty of theft of trade
secrets.